604 So.2d 280 (1992)
Fred FLEMING
v.
STATE of Mississippi.
No. 89-KA-276.
Supreme Court of Mississippi.
June 17, 1992.
*283 Jacqueline Smith Pierce, Jackson, for appellant.
Michael C. Moore, Atty. Gen., W. Glenn Watts, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and SULLIVAN and McRAE, JJ.
McRAE, Justice, for the Court:
Fred Fleming was convicted of strong-arm robbery and aggravated assault by the Circuit Court of Hinds County, and sentenced to serve a term of fifteen (15) years on the robbery conviction and twenty (20) years on the aggravated assault conviction in the custody of the Mississippi Department of Corrections, with both sentences to run concurrently. Fleming appeals to this Court, assigning ten separate grounds for reversal. We affirm, but we do so with great reluctance given the manner in which the attorneys for both the defense and the prosecution conducted the trial below.

Facts
On October 24, 1987, Officer Shirley Williams of the Jackson Police Department found Mr. Keith Nichols lying unconscious near his eighteen wheeler truck near a Jackson park called "The Community Center." Officer Williams smelled alcohol, but upon reviving, Nichols told her that someone had hit him on the head. Nichols was hospitalized for four days. His injuries included a laceration of the scalp requiring sutures, a non-displaced fracture of the left mandible (jaw bone), and a comminuted (pulverized) mid shaft fracture to the left ulna (outer forearm). The latter injury required surgery under general anesthesia. The surgeon attached a compression plate and performed a bone graft. Nichols was unable to return to work for at least four weeks. Nichols testified that while unconscious he had been deprived of a wallet *284 containing approximately $40, an envelope containing $60, and his keys. A portable television set, a CB radio, a cooler, and a water jug had been taken from inside his truck.
Nichols stated that on the evening of the attack he was preparing to carry a load to El Paso, Texas. As he was getting into his truck, several young men approached him and began to converse with him about truck driving. Suddenly, Nichols alleged, "they kinda grabbed me and I woke up beside the truck was the next thing I remembered." Nichols testified that Fleming was one of the young men, but admitted that he did not know who hit him.
Nichols claimed to have met Fleming for the first time earlier that same day. The two allegedly struck up a conversation near Nichols' truck. Nichols stated at trial that Fleming had asked for a ride to El Paso but that Nichols had refused since the company for which he worked did not allow riders. Nichols also admitted that he had asked Fleming where he could get some marijuana but denied actually getting any.
Sgt. Cleon Butler of the Jackson Police Department was assigned to the case. In the course of his investigation, Butler spoke with a confidential informant who had seen Fleming leaving the park area in the company of "a number of other black males" on the night the of the attack. Butler prepared a photographic spread which included a picture of Fleming along with four other subjects of similar age, stature, build, and ethnicity. On October 27, Butler showed the spread to Nichols, and Nichols identified Fleming.
On October 28, Fleming was arrested along with two other codefendants, Leroy Andrews and Flavian Gray. Andrews and Gray signed written statements in which they implicated themselves and Fleming in the attack and robbery.
Andrews testified against Fleming at trial. He stated that the robbery had been planned at a vacant house known as "the temple" and that Fleming had been present and participated in the planning. According to Andrews, the group proceeded from the temple to the scene of the attack. Gray was carrying a short iron pipe wrapped with red and black tape. At some point (Andrews did not know when), the pipe was transferred to Fleming's possession and Fleming perpetrated the assault upon Nichols. Andrews stated, however, that Gray, not Fleming, entered the truck to remove Nichols' property. He further testified that he did not know who relieved Nichols of his wallet.
On cross-examination, Andrews stated five times that his testimony did not result from a "deal" with the state. Defense counsel, however, produced a signed and notarized statement in which Andrews had declared: "Detective Butler told me that if I would tell him what Fred Fleming did that they would not charge me with strong armed robbery." The defense also brought out on cross-examination that Andrews had previously been convicted of aggravated assault and business burglary, that he had been drinking heavily on the occasion when Nichols was assaulted, and that he had twice come into court to plead guilty in the instant case but had changed his mind in hopes of getting a better "deal." The defense called Michael Hopson as a witness to impeach Andrews' testimony. Hopson, awaiting trial for capital murder, testified concerning a conversation he allegedly held with Andrews:
A. He [Andrews] said that Fred Fleming was mad with him `cause he won't tell the truth about hitting the man with the pipe. He said, "They don't have no proof or evidence that he hit the man with the pipe. Why should he tell it?" That's all.
.....
Q. They don't have any evidence that Leroy [Andrews] hit the man with the pipe 
A. Yes, ma'am 
Q.  and why should he tell it?
A. Yes, ma'am 
.....
Q. Was that all of the conversation?
A. Yes, ma'am.
On cross-examination, Hopson admitted that he and Fleming had been cell-mates *285 for several months and had become good friends.
Fleming testified in his own defense. He affirmed that he had spoken with Nichols during the afternoon of October 24; that Nichols had asked him where he could get marijuana, and that he had asked Nichols for a ride to El Paso. He further admitted that he had gone to the vacant house with his cousin Reginald that evening and that "a bunch of more guys" were there. He testified that he heard nothing about a robbery while there.
Afterwards, he and Reginald went to the park to talk with Nichols about taking Reginald to Texas. According to Fleming, Andrews, Gray, and "a bunch of them guys that was up to the house" had also come to the park. Nichols refused to take a rider to Texas, and Fleming began to walk away. Fleming further testified as follows:
Well, after I walk away  walked away, Reggie called me and I turnt `round. He came to me. He told me that they was gonna rob Keith Nichols. And Mr. Keith Nichols, when I looked at his  when I looked at him, he was getting off his truck, fixing to go `cross the park to his house. And I told Reggie that if he hadn't of brought all those guys down there with us that Keith Nichols probably would have took us out of town. And I told him not to rob Mr. Keith Nichols `cause Mr. Keith know where I stay at and he also  I had gave him my phone number and my name and told him if I hadn't came back to call and see was I still going.
Q. Okay. Then what happened after that?
A. Well, by the time me and Reginald got through talking, Mr. Keith Nichols was on his way back through the park and that's when he was attacked.
Q. Okay. Did you see what happened?
A. Yes, Ma'am, I seen what happened.
Q. All right. Tell the jury what happened.
A. I seen Leroy Andrews hit  hit  hit Mr. Keith Nichols in the head with a pipe.
Q. Do you know where that pipe came from?
A. No.
Q. Did you bring a pipe from the house?
A. No, ma'am, I didn't  I didn't have a pipe none that day.
Q. Did you see anybody rob Mr. Nichols?
A. Well, I seen `em beating Mr. Nichols and I seen Flavian Gray run to his truck and, you know, I just  I just looked at `em. They jumped on him, beat him.
The prosecution called Tyrone Mitchell as a rebuttal witness. Mitchell testified that he was in the vicinity of the park shortly after the incident occurred and saw Fleming, Gray, and Andrews climbing down out of Nichols' truck. He saw Nichols lying on the ground by the truck. He acknowledged on cross-examination that he did not see anything in Fleming's hands.
The prosecution also called Detective Jones to the stand as a rebuttal witness. Jones testified that he had taken a written statement from Leroy Andrews in October of 1987. The writing was introduced as a prior consistent statement.

Proceedings Below
Fleming was indicted at some time early in 1988. The precise occasion and contents of the indictment are unclear since the indictment does not appear of record. Fleming asserts in his appellate brief that it occurred in February, 1988; the state places the indictment in January, 1988. According to the state, the unrecorded indictment charged Fleming with only strong-arm robbery; Fleming states that the indictment included strong-arm robbery, aggravated assault, and habitual offender provisions. In any event, Fleming was reindicted on April 11, 1988 for strong-arm robbery, aggravated assault, and recidivism. The second indictment appears in the record.
On May 12, 1988, Fleming filed a Motion to Quash Indictment and Motion for Preliminary Hearing. He asserted that although a preliminary hearing had been held prior to his first indictment, the second *286 indictment was entered without the benefit of a second preliminary hearing. Fleming argued that he should have been afforded a second hearing prior to the second indictment since the second indictment included, in addition to strong-arm robbery, an additional count of aggravated assault.[1] The motion was apparently denied. Fleming subsequently filed another unsuccessful motion to quash the indictment on grounds that the warrant under which he was arrested had not been supported by an adequate affidavit.
During the first week of July, 1988, Fleming filed additional motions including a Motion for Severance of Defendants and a Motion for Discovery. On July 7, 1988, Fleming filed a Motion to Dismiss for Lack of A Speedy Trial. The motion was denied.
The case was tried before a jury on October 5 and 6, 1988. The jury found Fleming guilty of both strong-arm robbery and aggravated assault. On October 7, 1988, the court sentenced Fleming under the habitual offender statute to fifteen years imprisonment for strong-arm robbery and twenty years imprisonment for aggravated assault. The terms were to run concurrently without the benefit of probation or parole.
On October 12, 1988, Fleming filed a Motion for JNOV/New Trial. The motion was overruled. Fleming then perfected an appeal to this Court assigning the following as error:
I. The trial court erred in failing to grant a judgment notwithstanding the verdict of the jury.
II. The court erred in overruling appellant's motion for a new trial on the grounds that the verdict is contrary to law or the weight of the evidence, and on the grounds that justice requires a new trial because attorney for appellant allowed appellant to testify to his prior convictions.
III. The court should have granted appellant's instruction No. 17.
IV. Section 97-3-7(2) of the Mississippi Code is unconstitutionally vague because it does not make a distinction between "serious bodily injury" and "bodily injury."
V. The court erred in refusing to order the state to produce the recorded statement of the codefendant Leroy Andrews.
VI. The court erred when it denied appellant's motion to quash the indictment on the grounds that the affidavit is insufficient as a matter of law.
VII. The court erred in denying appellant's motions to compel disclosure of the confidential informant.
VIII. The court erred when it failed to dismiss the indictment for lack of a speedy trial.
IX. The in-court identification of appellant by the complaining witness had been impermissibly tainted by prior investigatory procedures.
X. The sentence received by appellant was a violation of the Eighth Amendment to the Constitution of the United States.

Summary of Arguments and Discussion of Law

I. WHETHER THE TRIAL COURT ERRED IN FAILING TO GRANT A JUDGMENT NOTWITHSTANDING THE VERDICT OF THE JURY?
Fleming argues that the trial court should have granted an acquittal notwithstanding the verdict on grounds that the prosecution produced insufficient evidence to sustain the conviction. Specifically, Fleming maintains (1) that the state introduced no evidence that he personally removed or intended to remove any of Nichols' property; and (2) that the state hangs its assault charge solely on the testimony of an accomplice whose story is self-contradictory and substantially impeached.
A trial court may properly set aside the verdict of a jury only where, viewing the evidence in the light most favorable to the verdict, no reasonable, hypothetical juror could have found that the defendant was guilty beyond a reasonable doubt. Lanier v. State, 533 So.2d 473, 479 (Miss. 1988). This Court detailed the trial *287 court's task in Lee v. State, 469 So.2d 1225 (Miss. 1985):
Where a defendant has moved for J.N.O.V., the trial court must consider all of the evidence  not just the evidence which supports the State's case  in the light most favorable to the State. May v. State, 460 So.2d 778, 781 (Miss. 1984). The evidence which is consistent with the verdict must be accepted as true. Williams v. State, 463 So.2d 1064, 1067 (Miss. 1984); Spikes v. State, 302 So.2d 250, 251 (Miss. 1974). The State must also be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Glass v. State, 278 So.2d 384, 386 (Miss. 1973). If the facts and inferences so considered point in favor of the defendant with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty, granting the motion is required. On the other hand, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that, having in mind the beyond-a-reasonable-doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied and the jury's verdict allowed to stand. May v. State, 460 So.2d 778, 781 (Miss. 1984).
Lee, 469 So.2d at 1229-30. On appeal, this Court will not reverse the denial of a motion for acquittal notwithstanding the verdict unless the verdict is against the substantial weight of the evidence. Leflore v. State, 535 So.2d 68, 70 (Miss. 1988).
"[B]efore a conviction of any crime may stand, there must be in the record evidence sufficient to establish each element of the crime." Fisher v. State, 481 So.2d 203, 211 (Miss. 1985); see Edwards v. State, 469 So.2d 68, 70 (Miss. 1985); Watson v. State, 465 So.2d 1025, 1031 (Miss. 1985); Neal v. State, 451 So.2d 743, 757 (Miss.), cert. denied 469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984). Relying on this rule of law, Fleming argues that the prosecution was required to prove that he personally committed every act listed in his indictment. The indictment, in its most pertinent language, charges that Fleming
[1] did, with intent;
[2] take the property of Keith Nichols;
[3] in the presence of Keith Nichols;
[4] by putting Keith Nichols in fear of some immediate injury to his person or by violence to his person;
[5] said property being one C.B. radio and one wallet containing approximately $60.00.
The record is replete with evidence that specific property was intentionally taken from the presence of Keith Nichols by violent means. Fleming contends, however, that the proof does not show that he personally took anything. Indeed, a close scrutiny of the record reveals no direct evidence and virtually no circumstantial evidence that Fleming took Keith Nichols' property. Apart from Flemings' mere presence at the scene (which he admits) the only evidence of asportation by Fleming is Tyrone Mitchell's testimony that he saw Fleming exiting Nichols' truck accompanied by Andrews and Gray. Several items of evidence suggest that Fleming did not personally remove anything from Nichols' possession: e.g., Mitchell's acknowledgement that he saw nothing in Fleming's hands when Fleming allegedly exited the truck; the testimony of Andrews that he did not know who removed Nichols' wallet; the additional testimony by Andrews that Fleming did not enter the truck; and Fleming's express denial of wrongdoing. Moreover, Fleming argues that the record contains no credible evidence that he wielded the weapon which felled Nichols. Again, he is right. The only evidence showing that Fleming personally struck Nichols is the substantially impeached testimony of codefendant Andrews.
If the state were required to prove that Fleming committed the crimes single-handedly, Fleming would perhaps prevail: The evidence presented does not solidly prove that Fleming struck Nichols or personally took his property. Fleming's argument misses the point, however, by ignoring this state's doctrine of "aiding and abetting." At trial, the court granted the following instruction:
[E]ach person present at the time, and consenting to and encouraging the commission *288 of a crime, and knowingly, wilfully and feloniously doing any act which is an element of the crime or immediately connected with it, or leading to its commission, is as much a principal as if he had with his own hand committed the whole offense.
This instruction embodies an accurate statement of the law. See Sayles v. State, 552 So.2d 1383, 1389 (Miss. 1989) (person who aids, counsels, or encourages another in commission of crime is equally guilty with principal offender). Whether Fleming personally committed each of these acts is thus irrelevant. The pertinent issue is whether he participated in or encouraged the crimes.
The evidence of Fleming's participation is threefold. First, there is codefendant Andrews' testimony that Fleming helped plan the crime and personally carried out the assault. Secondly, there is codefendant Gray's statement, introduced as hearsay through Sergeant Butler's testimony, that Fleming conspired to commit the crime and that Fleming left the "temple" carrying an iron pipe. Thirdly, there is Tyrone Mitchell's testimony that he saw Fleming, Andrews, and Gray climbing down out of Nichols' truck.
In determining whether this body of evidence is sufficient to sustain Fleming's conviction, we must initially observe the weaknesses attributable to each of these three articles of testimony. First of all, Andrews' testimony concerning Fleming's role in the assault requires corroboration. According to Fairchild v. State, 459 So.2d 793, 798 (Miss. 1984), a defendant may be convicted on the uncorroborated testimony of an accomplice only where the testimony is "reasonable and not improbable, self-contradictory, or substantially impeached." See also Evans v. State, 460 So.2d 824, 827 (Miss. 1984); Winters v. State, 449 So.2d 766, 771 (Miss. 1984); Rainer v. State, 438 So.2d 290, 292 (Miss. 1983); Gandy v. State, 438 So.2d 279, 285 (Miss. 1983); Mason v. State, 429 So.2d 569, 571 (Miss. 1983). Andrews' account was seriously and substantially impeached at trial. First, the defense elicited an admission from Andrews that he had agreed to testify against Fleming in exchange for the prosecution's promise not to prosecute him for robbery. The defense also highlighted the lack of candor implicit in Andrews' initial denial that he had made a "deal." In addition, Andrews admitted on cross-examination that he had been drinking heavily on the night of the incident. The most damning impeachment, however, came from Fleming's cellmate who testified that Andrews had told him that "Fred Fleming was mad with him `cause he won't tell the truth about hitting the man with the pipe."
Mitchell's testimony that he saw Fleming exiting Nichols' truck is circumstantial evidence supporting the prosecution's charge that Fleming participated in the crime. The state may prove a crime solely by circumstantial evidence, however, only where the circumstantial evidence is sufficient to prove the defendant's guilt beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence. Brown v. State, 556 So.2d 338, 340 (Miss. 1990); Sudduth v. State, 562 So.2d 67, 71-72 (Miss. 1990); Steele v. State, 544 So.2d 802, 808 (Miss. 1989); see also Murphy v. State, 566 So.2d 1201, 1204 (Miss. 1990) (where case rests wholly on circumstantial evidence, burden of proof is heavier than when direct evidence is offered). The defendant's own story  that he was a bystander who observed first-hand the assault and robbery of Keith Nichols  is a "reasonable hypothesis consistent with innocence" which Mitchell's testimony does not overcome. Fleming disavows having ever entered the truck, but such a denial is understandable for a man in Fleming's position. Even if Fleming did enter the truck during the course of the robbery as Mitchell's testimony implies, he could have done so out of curiosity about what the codefendants were doing. Alternatively, in light of his testimony that he sought to discourage the crime since Nichols knew his name and phone number, he could have entered the truck in an attempt to dissuade the perpetrators. Either scenario is a "reasonable hypothesis" which the state's circumstantial evidence does not refute.
The only direct and unimpeached evidence implicating Fleming in the crime is *289 Sergeant Butler's testimony regarding what Flavian Gray said in his written statement. Ironically, this testimony was elicited by the defense. When counsel for the defense began to cross-examine Butler, neither side had yet mentioned either the identity of Flavian Gray or the existence of written statements by codefendants. Nevertheless, the defense questioned Butler as follows:
Q. Now, do you recall the date that you got the statement from Leroy Andrews and Flavian Gray?
A. Yes, ma'am.
.....
Q. Okay. Do you recall whether or not they were willing to cooperate with you when you asked for that statement?
A. Yes, ma'am. They gave oral statements to the arresting officer and the following day of the arrest, which was the 28th, they gave me a signed and written statement to their involvement, as well as Freddie's.
Q. Do you recall Flavian Gray telling you that it was Leroy Andrews 
A. No, ma'am 
Q.  who hit him with an iron pipe?
A. No, ma'am.
.....
Q. Okay. Do you  in your investigation, did you locate the weapon at all that Mr. Nichols was hit with?
A. No, ma'am. We went back to the park based on the statement from the two codefendants, Leroy [Andrews] and Flavian [Gray]. They stated that Freddie had an iron pipe with tape. The pipe originated from a gang meeting they had had on Woodrow Wilson and Freddie left there with the pipe and I went back to the park, but I couldn't locate the pipe.
Q. Is that what they said 
A. So I assume somebody 
Q.  is that what they told you?
A. Yes.
The defense thus helped bring about Fleming's undoing. Although the version of events offered by an accomplice is to be viewed with "great caution and suspicion" (Gandy, 438 So.2d at 285),[2] it is nevertheless sufficient to sustain a conviction unless it is "[un]reasonable, improbable, self-contradictory, or substantially impeached." See Fairchild, 459 So.2d at 798; Gandy, 438 So.2d at 285. Neither Gray's statement nor Butler's repetition of it suffers from any of these infirmities.
Had the state elicited Butler's testimony concerning Gray's out-of-court statement, the defense could and should have objected on grounds of hearsay, the right to confrontation, and the right to cross-examination. See Sisk v. State, 290 So.2d 608, 610 (Miss. 1974) (conviction reversed where introduction of search warrant and affidavit "allowed the state to get into evidence hearsay statements which deprived appellant of the right of confrontation and cross examination"). But here, Butler testified at defense counsel's own prompting. It is axiomatic that a defendant cannot complain on appeal concerning evidence that he himself brought out at trial. See Singleton v. State, 518 So.2d 653, 655 (Miss. 1988); Davis v. State, 530 So.2d 694, 699 (Miss. 1988); Brown v. State, 534 So.2d 1019, 1024 (Miss. 1988), cert. denied, 490 U.S. 1007, 109 S.Ct. 1643, 104 L.Ed.2d 158 (1989); Lewis v. State, 445 So.2d 1387, 1389 (Miss. 1984); Simpson v. State, 366 So.2d 1085, 1086 (Miss.), cert. denied, 442 U.S. 930, 99 S.Ct. 2861, 61 L.Ed.2d 298 (1979); Sanders v. State, 219 So.2d 913 (Miss.), cert. denied, 396 U.S. 913, 90 S.Ct. 228, 24 L.Ed.2d 188 (1969); see also Shannon v. State, 321 So.2d 1, 2 (Miss. 1975) (no error where objectionable statements "were to a great extent the product of the cross and direct examinations by the defense attorney"). As the Court stated pithily in Reddix v. State, 381 So.2d 999, 1009 (Miss.), cert. denied, 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980): "If the defendant goes fishing in the state's waters, he must take such fish as he catches."
*290 If defense counsel had refrained from bringing Gray's statement into evidence, the state would have been left with Andrews' substantially impeached story and Mitchell's circumstantial testimony. We would then have been faced with deciding whether Mitchell's story of circumstantial involvement sufficiently corroborated codefendant Andrews' allegations of direct involvement. We need not decide that question, however, for two reasons. First, Butler's reiteration of Gray's statement is sufficient in and of itself to sustain Fleming's conviction. Secondly, Fleming's appellate counsel expressly conceded during oral argument that Mitchell's testimony created a question of fact for the jury. For purposes of this appeal, therefore, we must assume that Mitchell's testimony was sufficient to sustain the jury's verdict. See State ex rel. Suddoth v. Tann, 172 Miss. 162, 159 So. 539, 540 (1935) (point not argued on appeal is deemed waived); Rayl v. Thurman, 156 Miss. 8, 125 So. 912, 914 (1930) (assignment of error not argued will be taken as waived); see also 5B C.J.S. Appeal and Error § 1801 (citing Tann) ("Where an assignment of error has been waived, as it may be by ... express waiver or abandonment in ... oral argument, such error will not be further considered"). The trial court did not err in denying Fleming's motion for an acquittal notwithstanding the verdict.

II. WHETHER THE COURT ERRED IN OVERRULING APPELLANT'S MOTION FOR A NEW TRIAL ON THE GROUNDS THAT THE VERDICT IS CONTRARY TO LAW OR THE WEIGHT OF THE EVIDENCE, AND ON THE GROUNDS THAT JUSTICE REQUIRES A NEW TRIAL BECAUSE ATTORNEY FOR APPELLANT ALLOWED APPELLANT TO TESTIFY TO HIS PRIOR CONVICTIONS?
Fleming asserts that he should have been granted a new trial due to the admission into evidence of his prior felony convictions. Oddly, it was not the prosecution, but Fleming himself on direct examination by the defense, who first mentioned the prior felonies. Apparently trying to establish a rationale for Fleming's failure to intervene in the crime, counsel for the defense elicited the following testimony:[3]
Q. Now, is there a particular reason, Fred, that you wanted to stay out of trouble?
A. Yes, Ma'am.
Q. What is that reason?
A. I had recently got out of Parchman.
Q. For what crime?
A. Aggravated assault.
Q. Now, you've had some other crimes that you've been convicted of, haven't you?
A. Yes, ma'am.
Q. Have you served  have you  have you paid your debt to society for those crimes?
A. Yes, ma'am.
BY MR. MAYFIELD (Assistant District Attorney): If the Court please, I  I've got to object to that.
BY THE COURT: Overruled.
Q. And what did you determine, if anything, when you got out of the penitentiary the last time in regard to your life?
A. Excuse me.
Q. What did you determine, if anything, in regard to what you were going to do with your life when you got out of the penitentiary the last time?
A. Well, for one thing, I wasn't gonna go back and I  I was working. I was making good progress. I wasn't doing anything.
On cross-examination by the prosecution, Fleming testified as follows:
Q. In response to your lawyer's question a while ago, you said you'd paid your debt to society. *291 A. Yes, sir.
Q. What did you mean by that?
A. Well, I went to the penitentiary and I served time for what I did.
Q. In fact, on all of your previous convictions, in light of the seriousness of the crime, you were dealt with rather leniently, weren't you?
A. Yes.
(T. at 169).
On re-direct, defense counsel again returned to the prior conviction theme:
Q. Fred, this aggravated assault charge that you served time for, was that in connection with robbing anyone?
A. No, ma'am, it wasn't.
Q. Okay. What was that aggravated assault charge about?
A. Well, me and this  this lady that I knew, me and her was really friends and we was drinking together. And she gave me some stuff to sniff and I sniffed it and it hurt my nose  my nostrils and I throwed her on the floor and that's  that's what it started about.
(T. at 169-70).
As stated previously, a defendant cannot complain of evidence which he himself brings out. In Lewis v. State, 445 So.2d 1387 (Miss. 1984), this Court summarily disposed of a very similar matter:
The appellant next contends that the trial court erred in allowing testimony that he had a prior arrest. The appellant elicited the testimony on cross-examination of Detective Rochester and cannot now be heard to complain that it was error.
Lewis, 445 So.2d at 1389. Fleming insists that even though he divulged the prior convictions during his own direct examination, the trial court erred by allowing the prosecution to ask questions about the convictions on cross-examination. This Court has clearly held, however, that once the defense opens the door to otherwise improper testimony, the prosecution is permitted to enter and develop the matter in greater detail. See Gill v. State, 485 So.2d 1047, 1051 (Miss. 1986); Jefferson v. State, 386 So.2d 200, 202 (Miss. 1980).
Fleming's assignment of error is meritless.

III. WHETHER THE COURT SHOULD HAVE GRANTED APPELLANT'S INSTRUCTION NO. 17?
The trial court refused the defendant's Instruction No. 17 which read:
The Court instructs the jury that serious bodily injury means injuries involving great risk of death.
Fleming offered the instruction in response to the following language found in Count II of the indictment:
[The defendant] did purposely/knowingly/recklessly and feloniously cause serious bodily injury to the body of Keith M. Nichols ... under circumstances manifesting extreme indifference to the value of human life.
(emphasis added). The language of the indictment is a paraphrase of Miss. Code Ann. § 97-3-7(2) which characterizes a person as "guilty of aggravated assault if he (a) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." (Emphasis added).
According to Fleming, this Court defined "serious bodily injury" in a manner consistent with his proposed instruction in Colburn v. State, 431 So.2d 1111 (Miss. 1983). In Colburn, the appellant had been convicted of aggravated assault and appealed on grounds that the trial court had erred in refusing to instruct the jury concerning the lesser included offense of simple assault. In affirming, the court explained:
An instruction on a lesser-included offense should only be given after the trial court has carefully considered the evidence and is of the opinion that such an instruction is justified by the evidence. [Cite omitted]. Here, there was no evidence to the contrary that the wounds inflicted upon Mabel Colburn were anything other than serious with great risk of death. Based upon this record, we cannot say the trial court erred in refusing *292 appellant's proffered instruction on simple assault.
Colburn, 431 So.2d at 1114 (emphasis added). It is obvious that the Court in Colburn was not attempting to establish a minimum threshold for what constitutes "serious bodily injury." Rather, the Court was simply stating that an attack which caused "great risk of death" was so clearly within the realm of "aggravated" assault that an instruction concerning "simple" assault was unnecessary. The Court surely was not implying that an aggressor must beat his victim to within an inch of his life in order to be found guilty of aggravated assault.
Common sense dictates that the injuries inflicted upon Keith Nichols were "serious." The blow to his head knocked him unconscious and opened a flesh wound requiring sutures; his jaw was broken in two places; the injury to his arm required surgery under general anesthesia, a bone graft, and the insertion of a metal plate; he was unable to use his arm or return to work for at least four weeks. Nichols' affliction would qualify as "serious bodily injury" under the definition found in section 210.0 of the Model Penal Code (1980): Section 210.0 defines "serious bodily injury" as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." (Emphasis added).
One cannot sincerely contend that Nichols' injuries were not "serious." The assignment of error is without merit.

IV. WHETHER SECTION 97-3-7(2) OF THE MISSISSIPPI CODE IS UNCONSTITUTIONALLY VAGUE BECAUSE IT DOES NOT MAKE A DISTINCTION BETWEEN "SERIOUS BODILY INJURY" AND "BODILY INJURY?"
This is essentially an extension of Fleming's third assignment of error. Fleming contends that he was not given fair notice of the crime of aggravated assault since the statute does not define the term "serious bodily harm." Miss. Code Ann. § 97-3-7(2) refers to aggravated assault as an act which causes "serious bodily harm" while § 97-3-7(1) defines simple assault in terms of mere "bodily harm." Fleming insists that the assault perpetrated upon Nichols could reasonably be viewed as falling into the "bodily harm" category.
Unfortunately, Fleming has not preserved the issue for appeal. In his motion to dismiss the indictment, Fleming alleged that the indictment "fails adequately to charge this defendant with any offense against the laws of the State of Mississippi." When defense counsel argued its contention before the trial court, she stated:
You will notice the part of likely to produce death or serious bodily harm is not in the indictment. All it says is beating the said Keith M. Nichols on the head and body with an iron pipe. And of course, you could beat him on the head where it didn't cause any serious bodily harm. I would respectfully point out to the Court that that is a substantial part of the statute and he is not noticed correctly with the crime of aggravated assault. As a matter of fact, the way the indictment is worded it might could be simple assault as well as aggravated assault. And I respectfully suggest that both of those parts of the indictment are insufficient.
Fleming thus seems to have argued that the indictment did not conform to the statute, not that the statute was unconstitutionally vague. Constitutional arguments not asserted at trial are waived. Smith v. State, 430 So.2d 406, 407 (Miss. 1983). Moreover, an objection on one or more specific grounds constitutes a waiver of all other grounds. Stringer v. State, 279 So.2d 156, 158 (Miss. 1973); see McGarrh v. State, 249 Miss. 247, 276, 148 So.2d 494, 506 (1963) (objection cannot be enlarged in reviewing court to embrace omission not complained of at trial); see also Livingston v. State, 525 So.2d 1300, 1303 (Miss. 1988); Sims v. State, 512 So.2d 1256, 1258-59 (Miss. 1987). The case of Colburn v. State, 431 So.2d 1111 (Miss. 1983) is quite dispositive. The Court there stated:

*293 Appellant contends that the statute is unconstitutionally vague because it fails to delineate a guide a jury could follow as to what constitutes serious bodily injury and what circumstances manifest an extreme indifference to the value of human life.
The constitutionality of section 97-3-7(2) was never raised in the trial court. Appellant filed no demurrer, motion to quash, or objection, nor was mention made in his motion for a new trial as to the constitutionality of section 97-3-7(2). This Court has continuously adhered to the rule that questions will not be decided upon appeal which were not presented to the trial court and that court given an opportunity to rule on them... .
Appellant, by failing to attack the constitutionality of section 97-3-7(2) by proper motion waived any error in this regard and cannot now seek reversal on this ground in this Court.
Colburn, 431 So.2d at 1113-14. Unlike the defendant in Colburn, Fleming did file a demurrer and a motion to quash. Neither document, however, raises the void-for-vagueness issue with regard to § 97-3-7(2). Fleming's motion for JNOV/New Trial likewise fails to raise the issue. Under the clear holding of Colburn, Fleming is barred from raising the matter before this Court.
Even if he had properly preserved the question, it does not appear that he would be entitled to prevail. A statute is not unconstitutionally vague unless people of common intelligence must guess at its meaning and differ as to its application. Shamloo v. Mississippi State Bd. of Trustees of Institutions of Higher Learning, 620 F.2d 516 (5th Cir.1980); see Cumbest v. State, 456 So.2d 209, 220 (Miss. 1984) (criminal statute must be worded so that person of ordinary intelligence has reasonable opportunity to know what is prohibited); see also United States v. Barnett, 587 F.2d 252 (5th Cir.1978) (criminal statute must exhibit only a "reasonable" degree of certainty in order to pass vagueness test), cert. denied, 441 U.S. 923, 99 S.Ct. 2031, 60 L.Ed.2d 396 (1979).
Section 97-3-7(2) is not unconstitutionally vague, particularly when applied in a case involving brutal injuries like those Nichols suffered. In more ambiguous cases, we suggest that prosecutors and trial courts refer to the definition of "serious bodily injury" set out in the Model Penal Code (see supra at 292).
The assignment of error is without merit.

V. WHETHER THE TRIAL COURT ERRED IN REFUSING TO ORDER THE STATE TO PRODUCE THE RECORDED STATEMENT OF THE CODEFENDANT LEROY ANDREWS?
On the day he and Fleming were arrested, Andrews signed a written statement at police headquarters. The defense sought to discover the statement, and a hearing was held. During the hearing, the trial court observed that the recorded statement of a codefendant "can be obtained if exculpatory or if there are contradictions in his testimony between his testimony and his statement." After inspecting the statement in camera,[4] the judge stated:
I don't find anything exculpatory in the two statements. They will be made appellate exhibits. And again, if those witnesses testify you can move at that time for the Court to examine the statements to see if they differ from the in-court testimony and then would be discoverable.
At trial, the defense questioned Sergeant Butler extensively on cross-examination concerning Andrews' prior statement. The state then sought to introduce the statement into evidence, but the court refused. When cross-examining Andrews, the defense sought to suggest that Andrews had fabricated his account in order to procure a "deal" with the prosecution. Later, the prosecution made the following statement to the court out of the hearing of the jury:

*294 I expect there to be an objection about a prior inconsistent statement by the witness, Leroy Andrews. I intend to offer through the rebuttal witness a prior consistent statement  written statement given by the witness Leroy Andrews. That's what I intend to do through this next witness.
Counsel for the defense then stated: "I object to that Your Honor. He's available to be called as a witness in rebuttal and I object to it on that ground." The state subsequently called Detective Gerald Jones to the stand and introduced through him the written statement of Leroy Andrews. The defense interposed no additional objection.
At no point in the trial did the defendant request that the Andrews statement be provided to him. Never did the defendant object on grounds that the statement should have been provided to him. In the absence of a timely objection, the defendant is procedurally barred from asserting the alleged error on appeal. Lambert v. State, 518 So.2d 621, 625 (Miss. 1987). In any event, an inspection of Andrews' written statement reveals that the court below was correct in concluding that the statement contained no exculpatory material. Further, any inconsistencies between the statement and Andrews' testimony at trial are immaterial (e.g., the location at which Fleming was standing when Andrews arrived at the park). The trial court did not err in refusing to order the production of the statement.

VI. WHETHER THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO QUASH THE INDICTMENT ON THE GROUNDS THAT THE AFFIDAVIT IS INSUFFICIENT AS A MATTER OF LAW?
Fleming contends that his indictment should have been quashed on grounds that he was arrested without probable cause. In his second Motion to Quash Indictment, he alleged that he was arrested without a warrant, and that an affidavit was not filed until more than a month after his arrest. The affidavit, he asserted, failed to affirmatively state that the arresting officer got his information from an informer or that the informer was reliable and trustworthy. Fleming argues that the affidavit was of the "bare bones" variety which the United States Supreme Court condemned in Illinois v. Gates, 462 U.S. 213, 239, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). During the hearing on Fleming's motion to quash, the following exchange occurred:
BY [PROSECUTOR]: The State concedes that everything counsel said is absolutely true. None of it bears on the validity of the indictment and the context of the motion to quash. All of the things that counsel said, even if taken as true, would simply go to the admissibility of possible evidence at trial and have nothing to do with the validity of the indictment. And for that reason the State would object to any testimony on that point for that very reason.
.....
BY THE COURT: All right. I'm going to sustain the objection to the testimony because in my opinion the issue of probable cause would go to the admissibility of certain evidence or the lack of admissibility of certain evidence rather than to the quashing of the indictment. Since this is a motion to quash the indictment the evidence would not be helpful.
The caselaw supports the position of the prosecution and the conclusion of the trial court. In White v. State, 507 So.2d 98 (Miss. 1987), this Court stated:
An illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction.
Id. at 101 (quoting United States v. Crews, 445 U.S. 463, 474, 100 S.Ct. 1244, 1251, 63 L.Ed.2d 537 (1980)); see also Jackson v. State, 337 So.2d 1242, 1247 (Miss. 1976) (illegal arrest does not bar prosecution for crime charged but may result in suppression of any evidence obtained thereby). In the instant case, the prosecution introduced no arrest-related evidence at trial. Accordingly, the issue is controlled by Nicholson *295 v. State, 254 So.2d 881 (Miss. 1971) where this Court stated:
It is not necessary to pause to ascertain whether [appellant's] arrest was legal, because assuming his arrest was illegal the trial court was correct in ruling the circumstances of his arrest were immaterial. The state did not use any evidence or a confession obtained by virtue of the arrest. Appellant was indicted by the grand jury, was present in court, and was tried after having been fully apprised of the charges against him. He was convicted in a fair trial in a county where the crime was committed, and the jurisdiction of the court was in no way impaired by the manner in which he was brought before it. Of course, a different situation exists where the state attempts to introduce evidence or a confession obtained as a result of an illegal arrest. Under these circumstances the "fruit of the poisonous tree" doctrine then might well become applicable.
Id. at 883; see also Pasto v. State, 356 So.2d 587, 589 (Miss. 1978) (legality or illegality of arrest irrelevant where no evidence was introduced emanating from arrest). The assignment or error is groundless.

VII. WHETHER THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTIONS TO COMPEL DISCLOSURE OF THE CONFIDENTIAL INFORMANT?
At the pre-trial hearing, the defense requested disclosure of the confidential informant who purportedly informed the police about Fleming's presence at the crime scene. The prosecutor acknowledged that there had been a confidential informant, but explained that the informant had given information pertaining to Fleming's codefendants, not Fleming himself. "Nothing against this man [Fleming] was obtained from a confidential informant," the prosecutor stated. Later, the prosecutor added:
We don't claim that he [the informant] is [a material witness], nor do we intend to call him as such, your Honor. And again, as best as I can determine, it only went to identification of the two codefendants which, of course, was a part of the arrest of this defendant. But there were really two separate, really two separate identifications processes. The identification of this defendant took place at one time, and then the identification of this two codefendants was from an independent source.
The trial court then ruled that "Mr. Fleming would not have standing to complain of the confidential informant against [codefendants] Andrews and Gray."
At trial, Jackson Police Officer Cleon Butler testified that he had concluded that Fleming was a suspect in the crime based on "information from a confidential informant." Butler testified on cross-examination that the informant "saw Freddie Fleming, along with several other black males, in the Pocahontas Street area, which is east of the park." The defense, in the presence of the jury, continued to question Butler:
Q. Did you ask him [the informant] if he had seen a fellow named Tyrone?
A. No.
Q. Did you ask him if he'd seen Bow Tie or Bojack?
A. No, I don't  I didn't know Bow Tie or Bojack, no.
.....
Q. Fred was the only one you asked him if he saw?
A. No, I didn't ask him if he saw Freddie Fleming. I asked him if he saw anybody leaving the park area, and Freddie Fleming was the name he gave.
Q. Did he give you any other names?
A. No, not specifically.
BY MS. PIERCE [DEFENSE COUNSEL]: Your Honor, I would like at this time to approach the bench.
(COURT/COUNSEL DISCUSSION AT BENCH OUT OF THE HEARING OF THE JURY:)
BY MS. PIERCE: I had made a motion previously to name the informer and I was denied and I would like to renew that motion at this time. I know he said that he saw Fred Fleming running away from the scene of the crime. I *296 think that's close enough to being a witness and he has a right to know his name.
BY MR. MAYFIELD [THE PROSECUTOR]: I can't imagine what for. She just  she told the Jury her client was in the park. That's been pretty well established and he doesn't claim to have been an eyewitness to the crime.
BY THE COURT: Motion denied.
After resuming Butler's cross-examination, counsel for the defense asked:
Q. Is that the only way that you had of developing this case was that one informant's information?
A. No, ma'am. The case further developed as a result of two statements that I received from two other codefendants that were with Freddie that gave statements on Freddie as being the one that hit him with the pipe, but that was the entirety of the case itself.
The defense later asked Butler essentially the same question again:
Q. How many other people did you talk to besides the informant?
A. I talked to Leroy Andrews, who gave a written statement. I talked to Flavian Gray, who also gave a written statement.
Q. I'm talking about prior to your showing the pictures to Mr. Nichols. How many other people did you talk to besides the informant?
A. None.
After the defense finished cross-examining Butler, the court expressed a desire to "develop a little bit more about the confidential informant" out of the hearing of the jury.
Q. [BY THE COURT:] Sergeant Butler, you said you had a confidential informant that said that he saw the Defendant leave the park, was that it, or running away from the scene or what?
A. Yes, sir.
Q. If you would, go into a little more detail about where he was when he saw him and 
A... . [T]here was fifteen or sixteen people in the park at the time that the incident happened. Okay. And they saw  they all ran and they saw Freddie, along with several others who they didn't know by their whole names. They called partial names and nicknames and Freddie was the only name that they knew... . But now, Tyrone Mitchell was  was one of the witnesses that was talked to during the initial investigation. Bow Tie you asked about, that's his real name, Tyrone Mitchell, who was also a witness.
Q. He was there at the scene, but that's not your confidential informer?
A. Well, he was one of them, yes, sir... .
.....
Q. But your confidential informer, was he a witness  actual witness to the robbery 
A. Not the robbery itself, no, sir.
Q. But  and you say he advised you that he saw several people running from the scene and the only one he knew by name was the Defendant?
A. That's correct. He knew several others  he called several other names and a result of partial names which I didn't know. One of the members of the gang unit, Detective Gardner, developed Leroy Andrews and Flavian Gray as suspects based on partial names that he  that he come up with.
Q. All right. And they are codefendants in this case?
A. Yes, sir.
The prosecution later questioned Butler as follows:
Q. Sergeant, did your informant ever tell you that he saw Fredrick Fleming beat, stomp, kick, or rob anybody?
A. No the informant didn't see anything.
The trial court then stated: "Okay. My ruling stands. I don't believe the informer is a material witness."
In his case-in-chief, Fleming testified in his own behalf and called witness Michael Hobson to impeach the testimony of Leroy Andrews. Afterwards, the prosecution *297 called Tyrone Mitchell as a rebuttal witness and questioned him as follows:
Q. Do you remember when Mr. Keith Nichols got beaten and robbed last year in October?
A. Yes, sir.
Q. Were you close by shortly after that happened?
Keith Nichols' truck?
A. If was three people. It was 
Q. And who were those people?
A. It was Flavian, Fred [Fleming] and Leroy.
This lengthy recitation from the record raises some pertinent implications. First, it is clear that Tyrone Mitchell was the confidential informant whose identity the defense sought to discover prior to the trial. Butler testified that "the entirety of the case" against Fleming stemmed from the information obtained from a single informant along with the statements given by Fleming's two codefendants. He later reiterated that in the course of the initial investigation, he had spoken with no one besides the informant and the codefendants. Still later, Butler acknowledged that Mitchell was a confidential informant who saw Fleming at the scene of the crime. Simple logic dictates that if (a) law enforcement officials obtained information linking Fleming to the crime from a single informant, and (b) Mitchell was a confidential informant who saw Fleming at the scene, then (c) Mitchell must have been the single confidential informant.
It is also abundantly clear that the prosecution blatantly dissimulated the substance of what Mitchell had told them, even to the point of misleading the trial court. Prior to trial, the prosecution maintained that "[n]othing against this man [Fleming] was obtained from a confidential informant" and that the information obtained from the informant served only to identify Fleming's codefendants. Based on these representations, the trial court found that the identity of the informant was not relevant to Fleming's defense. At trial, Sergeant Butler's testimony revealed that Fleming became a suspect based on "information from a confidential informant." This revelation directly contradicted the prosecutor's earlier assertion that "[n]othing against this man [Fleming] was obtained from a confidential informant." Both Butler and the prosecutor still insisted, however, that Mitchell had merely seen Fleming leaving the park and was not an eye-witness to the crime. Apparently accepting the prosecution's portrayal of what Mitchell had seen (or, more accurately, what he had not seen), the trial court reaffirmed its ruling that the informant was not a material witness. Despite the prosecutor's assurances that Mitchell was not an eye-witness to the crime, Mitchell later testified at the prosecutor's prompting that he had seen Fleming climbing out of Nichols' truck accompanied by the codefendants. In essence, Mitchell claimed to have seen Fleming "red-handed" at the scene. The testimony was undeniably "material." Further, Mitchell's account was clearly no surprise to the prosecutor. The form of the prosecutor's question shows that he knew how Mitchell would respond. It is amazing how far the prosecutor traveled from his original contention that "[n]othing against this man was obtained from a confidential informant."
According to Garvis v. State, 483 So.2d 312, 316 (Miss. 1986), the state is not entitled to withhold the identity of a material witness to the facts constituting the crime with which a defendant is charged. See also Breckenridge v. State, 472 So.2d 373, 377 (Miss. 1985); Daniels v. State, 422 So.2d 289, 292 (Miss. 1982). In the case sub judice, Mitchell's eye-witness account was the only independent testimony which tended to corroborate Andrews' story about Fleming's participation in the crime. Without Mitchell's testimony, the state's case would have rested almost exclusively on the uncorroborated tales of two codefendants  the testimony of one substantially impeached and thus insufficient to convict; the statement of the other open to doubt and suspicion. Aided by Mitchell's testimony, however, the prosecution succeeded in overcoming the handicaps inherent in the codefendants' testimony. Mitchell was most assuredly a "material" witness, and *298 the trial court erred in deciding otherwise.[5] Fleming was entitled to disclosure.
Nevertheless, the trial court's error does not require reversal. However, the defense dropped the ball by failing to object to the testimony of Mitchell at trial. Fleming discovered at trial that Mitchell was the informant, subsequently confronted and cross-examined him, which brought out the damning testimony in the presence of the jury. As this Court explained in Ward v. State, 293 So.2d 419, 421 (Miss. 1974), confrontation and cross-examination are the very rights which require disclosure of material witnesses in the first place. Fleming fully exercised those rights at the trial below. Consequently, the error was waived.

VIII. WHETHER THE TRIAL COURT ERRED WHEN IT FAILED TO DISMISS THE INDICTMENT FOR LACK OF A SPEEDY TRIAL?
Fleming contends that he was denied his right to a speedy trial under the Sixth and Fourteenth Amendments to the United States Constitution and under Article 3, Section 26 of the Mississippi Constitution.[6] The record reflects the following chronology of pertinent events:

 DELAY
 FOLLOWING
 EVENT
 DATE EVENT (IN DAYS)
----------------------------------------------------------------------------
10/27/87 Fleming arrested 69
12/9/87 defense counsel appointed
1/4/88 preliminary hearing on strong-arm robbery charge
 followed by indictment at some point later in month 98
4/11/88 reindictment for strong-arm robbery with added charge
 of aggravated assault 24
5/5/88 Fleming served prosecution with motion for speedy
 trial but declined offer to set trial for following
 week 71
5/12/88 Fleming files motion to quash indictment
7/5/88 Fleming files motion for severance of defendants and
 motion for discovery
7/7/88 Fleming files motion to dismiss for lack of speedy
 trial
7/15/88 hearing on pretrial motions 24
8/8/88 continuance 58
10/5/88 trial __
 __________
 TOTAL 344

When considering appeals based on the constitutional right to a speedy trial, this Court applies the four-part test set out by the United States Supreme Court in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). See Adams v. State, 583 So.2d 165, 167 (Miss. 1991); Wiley v. State, 582 So.2d 1008, 1011 (Miss. 1991); State v. Ferguson, 576 So.2d 1252, 1254-55 (Miss. 1991); Flores v. State, 574 So.2d 1314, 1322 (Miss. 1990); Craig v. State, 284 So.2d 57, 58 (Miss. 1973). Under Barker, the Court determines whether a delay offends constitutional speedy trial guarantees by weighing the following factors: (1) the length of delay; (2) the *299 reason for delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether the defendant has been prejudiced by the delay. See Barker, 407 U.S. at 530-33, 92 S.Ct. at 2191-93. Of these, no one factor is dispositive and the weight given each turns on the peculiar facts and circumstances of each case. Adams, 583 So.2d at 167; Wiley, 582 So.2d at 1011; Ferguson, 576 So.2d at 1254.

1. Length of Delay

For purposes of Fleming's constitutional speedy-trial claim, delay is calculated from the day he was arrested. Adams, 583 So.2d at 167; Flores, 574 So.2d at 1321. As the foregoing chart reveals, a total of 344 days, or about eleven months, transpired between Fleming's October 27, 1987, arrest and the commencement of his trial on October 5, 1988. This Court has held that a delay of seven months or more is sufficient to require further inquiry into the other three factors. See Adams, 583 So.2d at 168; Smith v. State, 550 So.2d 406, 408 (Miss. 1989). A delay of eight months or more is presumptively prejudicial. Adams, 583 So.2d at 168; Smith, 550 So.2d at 408. The first prong of the Barker test, therefore, raises a presumption that Fleming has been deprived of his constitutional right to a speedy trial.

2. Reason for Delay

The state bears the risk of non-persuasion regarding the reason for delay and must show either that the defendant caused the delay or that good cause existed for the delay. Wiley, 582 So.2d at 1012; Ferguson, 576 So.2d at 1254; Smith, 550 So.2d at 409. To the extent that the state can show that the defendant caused the delay or that the delay was beyond the state's control, this factor does not weigh against the state. Wiley, 582 So.2d at 1012. To the extent the state is responsible for the delay, however, the factor is charged against the state.
From the time of Fleming's arrest on October 27, 1987, until he served his first motion for a speedy trial on May 5, 1988, a total of 191 days (about six months) passed. The record gives no indication that Fleming was responsible for any part of this delay. Fleming was indicted twice during this 191 day period, and he argues in his brief that the second indictment was a "delaying tactic because the state was not ready to go to trial." Under the Barker analysis, if the state deliberately causes a delay, the impediment weighs "heavily" against the state. Wiley, 582 So.2d at 1012; Barker, 407 U.S. at 531, 92 S.Ct. at 2192. There is nothing in the record, however, to substantiate Fleming's claim of culpability on the part of the state. Nevertheless, since the state bears the risk of nonpersuasion, even a "neutral" reason for delay must weigh against the state, albeit lightly. See Barker, 407 U.S. at 531, 92 S.Ct. at 2192 ("A more neutral reason ... should be weighed less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.").
Upon being served with Fleming's motion for speedy trial on May 5, 1988, the prosecution offered Fleming a trial the following week. Fleming's defense counsel declined, explaining later: "A week is speedy all right, but I thought he was joking, really... . I apologize if it was a serious offer." Defense counsel declined a second offer for expedited trial at the July 15 hearing on Fleming's second motion for speedy trial. The record reflects the following:
BY THE PROSECUTION: In the presence of the court I will make you a serious offer of a trial date next week or the next week or whenever you'd like, Ms. Pierce.
BY DEFENSE COUNSEL: I think the trial date has been set for August 8.
BY THE PROSECUTION: If you want it speedier than that I'll do whatever I can to accommodate you.
.....
BY THE COURT: All right. If the Court is able to afford a trial date before August 8, 1988 are you in a position to try the case earlier than that?

*300 BY DEFENSE COUNSEL: Well, Your Honor, that is only what, about three weeks away? My calendar would not allow that. I would like to, I really would. But you know, I've got other hearings and so forth that it just would not  at this point it would not be fair to the defendant because of the preparation that it takes at the last minute for a trial. I mean I want a speedy trial but certainly I need to have at least two or three weeks notice when the trial is going to take place. I don't think that is prejudicial to the defendant at all on my part.
It is clear that the responsibility for delay during the months of May, June, July, and the first week of August must lie squarely at Fleming's door. The state twice offered to try the case; the defense twice declined. Defense counsel professed to believe that the state was not being serious in offering early trial dates; it appears more likely that the defense was not being serious in its quest for a speedy trial. Stated simply, the defense was not ready. It is noteworthy that although defense counsel was appointed in December, 1987, the defense did not even commence discovery until the first week of July, 1988.
A continuance postponed the trial from August 8 until October 5. The record is silent concerning who requested this continuance and the purpose for which it was granted. The state has declined to enlighten us. Since the risk of non-persuasion rests with the state, this two-month delay must weigh in favor of Fleming.

3. Assertion of Right

Fleming twice filed motions seeking a speedy trial. Technically, therefore, he "asserted his right." But as noted above, Fleming's protestations of delay apparently amounted to no more than mere posturing. When offered an advanced trial date, the defense hastily backpedaled.
If one demands a speedy trial, one must be prepared to go to trial speedily. Fleming was not. Absent a serious assertion of his right to a speedy trial, this factor must count against him. The recent Adams decision is instructive:
Adams made his first mention of speedy trial on November 21, 1988... . Adams' counsel rejected a tentatively offered trial the following week because of his schedule and expressed the desire that the trial be scheduled for January... . Thus it is seen that Adams never really asserted a right to a speedy trial.
Adams, 583 So.2d at 169. In Adams we concluded: "Under the circumstances of this case, Adams' assertion of his speedy trial right affords him little because of the manner and the time in which it was raised. We weigh this factor against him in the balancing test." Adams, 583 So.2d at 170.
As was true of the defendant in Adams, Fleming "never really asserted a right to a speedy trial." His failure to do so must be given "strong evidentiary weight" in the Barker analysis. See Adams, 583 So.2d at 170; Barker, 407 U.S. at 531, 92 S.Ct. at 2192.
4. Prejudice

Inordinate delay, wholly aside from possible prejudice to a defense on the merits, may `seriously interfere with the defendant's liberty, whether he is free on bail or not, and ... may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety, in him, his family and his friends.' United States v. Marion, 404 U.S. 307, 320 [92 S.Ct. 455, 463, 30 L.Ed.2d 468] (1971). These factors are more serious for some than for others but they are inevitably present in every case to some extent.
Trotter v. State, 554 So.2d 313, 318 (Miss. 1989) (quoting Moore v. Arizona, 414 U.S. 25, 26-27, 94 S.Ct. 188, 190, 38 L.Ed.2d 183 (1973). The United States Supreme Court in Barker observed that
[t]here are cases in which delay appreciably harms the defendant's ability to defend himself. Moreover, a defendant confined to jail prior to trial is obviously disadvantaged by delay as is a defendant released on bail but unable to lead a normal life because of community suspicion and his own anxiety. .. . Moreover, if defendant is hindered in his ability to gather evidence, contact witnesses or *301 otherwise prepare his defense, imposing these consequences on anyone who has not yet been convicted is serious.
Barker, 407 U.S. at 526, 92 S.Ct. at 2190. In the case sub judice, Fleming has made no showing of actual prejudice. In his appellate brief, he points out that the testimony of Keith Nichols
depended heavily on his identifying the appellant as one of those who attacked him. He had over a year after he was shown the photographs to think along these lines, and it is possible that by the time twelve months had passed, he had convinced himself that indeed Fred Fleming was in the group which grabbed him.
Apart from the fact that the trial occurred somewhat less than, not more than, a year after the attack, Fleming's argument is flawed. Whether Nichols "convinced himself" that Fleming was present at the scene is irrelevant: Fleming admits he was there. Nichols never testified that Fleming hit him. Rather, he acknowledged at trial that he had no idea who was the aggressor.
Fleming further asserts that since he was incarcerated from the time of his arrest until the time of his trial, the length of detainment was "oppressive." See Vickery v. State, 535 So.2d 1371, 1377 (Miss. 1988) (right to speedy trial is designed to protect against, inter alia, oppressive pre-trial incarceration); see also Hughey v. State, 512 So.2d 4, 11 (Miss. 1987) (citing Barker, 407 U.S. at 532-33, 92 S.Ct. at 2192-93). Perhaps so, but one must remember that the length of Fleming's incarceration is due in large part to the failure of the defense to make timely preparation for trying the case. If Fleming's incarceration stretched to an "oppressive" length, the state cannot be faulted.
Fleming thus makes no real showing of prejudice. Accordingly, he is left with only the presumptive prejudice arising under the first Barker factor.[7]See Adams, 583 So.2d at 170 (defendant left with only presumptive prejudice absent showing of actual prejudice).

5. Balancing

The delay between Fleming's arrest and his trial is sufficient to raise a presumption of prejudice. The record indicates, however, that Fleming contributed significantly to the delay, that Fleming never seriously asserted his right to a speedy trial, and that the presumption is not bolstered by a showing of actual prejudice. Considered together, the Barker factors weigh strongly against the appellant. Fleming was not denied his right to a speedy trial.

IX. WHETHER THE IN-COURT IDENTIFICATION OF APPELLANT BY THE COMPLAINING WITNESS HAD BEEN IMPERMISSIBLY TAINTED BY PRIOR INVESTIGATORY PROCEDURES?
Nichols identified Fleming in open court as having been in the group with which he spoke at the park at the time he was attacked. Fleming contends on appeal that the in-court identification was tainted by impropriety in Nichols' prior identification of Fleming from photographs which Sergeant Butler showed him three days after the attack. According to Fleming, the photographic identification was "highly suggestive and prejudicial" since the spread contained no photographs of other persons who had been in the park at the time of the attack.
Fleming also objects to the in-court identification on grounds that it fails the "totality of circumstances" test set out in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) and often followed by this Court. Under this test, the Court evaluates *302 an in-court identification in terms of the following:
(1) the opportunity of the witness to view the accused at the time of the crime;
(2) the degree of attention exhibited by the witness;
(3) the accuracy of the witness' prior description of the criminal;
(4) the level of certainty exhibited by the witness at the confrontation;
(5) the length of time between the crime and the confrontation.
Ray v. State, 503 So.2d 222, 223 (Miss. 1986); Magee v. State, 542 So.2d 228, 232 (Miss. 1989). Fleming argues that Nichols had "very little opportunity to observe appellant prior to the assault," that it was dark, that Nichols had been drinking alcohol, and that nearly a year passed between the incident and the in-court identification.
As the state is quick to point out, Fleming did not object to the in-court identification at trial. Opinions are legion in which this Court has held that a failure to object is fatal for purposes of preserving error. See, e.g. Smith v. State, 530 So.2d 155, 161-62 (Miss. 1988); Williams v. State, 512 So.2d 666, 672 (Miss. 1987); Johnson v. State, 477 So.2d 196, 214 (Miss. 1985), cert. denied, 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986); see also Singleton v. State, 518 So.2d 653, 655 (Miss. 1988); Crawford v. State, 515 So.2d 936, 938 (Miss. 1987); Tubbs v. State, 402 So.2d 830 (Miss. 1981). Accordingly, Fleming has waived his objection to Nichols' in-court identification.
Even if Fleming had made a timely objection and the trial court had overruled it, his assignment of error would still fail. Nichols' in-court identification proved no more than what the defendant readily admitted at trial  that he was present at the scene. It makes no sense for Fleming to object to Nichols' identifying him as being there when Fleming himself states that he was in fact there.
Fleming's application of the "totality of circumstances" test likewise rings hollow. He argues that "Nichols had very little opportunity to observe appellant prior to the assault," and yet he testified at trial that he held a conversation with Nichols prior to the assault. He notes that Nichols had "been drinking alcohol," but nothing in the record indicates that Nichols was drunk at the time.
The assignment of error is without merit.

X. WHETHER THE SENTENCE RECEIVED BY APPELLANT VIOLATED THE EIGHTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES?
Fleming argues that his sentence of twenty years imprisonment for aggravated assault is disproportionate to the crime and violates the Eighth Amendment to the United States Constitution. Fleming was sentenced under Miss. Code Ann. § 99-19-81, the habitual offender statute, to the twenty-year maximum term for aggravated assault as set out in Miss. Code Ann. § 97-3-7(2).
This Court has previously ruled that the twenty-year maximum set by § 97-3-7(2) does not constitute cruel and inhuman treatment per se. See Adams v. State, 410 So.2d 1332, 1333-34 (Miss. 1982). Further, the general rule in this state is that a sentence cannot be disturbed on appeal so long as it does not exceed the maximum term allowed by statute. See Corley v. State, 536 So.2d 1314, 1319 (Miss. 1988); Reed v. State, 536 So.2d 1336, 1339 (Miss. 1988). This Court will review a sentence, however, where it is alleged that the penalty imposed is disproportionate to the crime charged. See Ashley v. State, 538 So.2d 1181, 1184-85 (Miss. 1989); Davis v. State, 510 So.2d 794, 797 (Miss. 1987); Presley v. State, 474 So.2d 612, 618 (Miss. 1985). Fleming alleges such here.
The United States Supreme Court set out three factors for courts to consider when conducting a proportionality analysis. The criteria include:
(1) the gravity of the offense and the harshness of the penalty;
(2) the sentences imposed on other criminals in the same jurisdiction; and

*303 (3) the sentences imposed for commission of the same crime in other jurisdictions.
Solem v. Helm, 463 U.S. 277, 292, 103 S.Ct. 3001, 3011, 77 L.Ed.2d 637 (1983). We have occasionally applied the Solem test when reviewing the imposition of recidivist sentences. See, e.g., Clowers v. State, 522 So.2d 762, 764 (Miss. 1988); Davis, 510 So.2d at 797; Presley, 474 So.2d at 618. We have reduced or reversed such sentences, however, only where the sentence is "grossly disproportionate" to the crime. See Davis, 510 So.2d at 797; see also Presley, 474 So.2d at 621 (sentence reversed on proportionality grounds only where it is "shockingly excessive") (Robertson, J., specially concurring).
Fleming's sentence passes the Solem test. First, the twenty-year term does not appear on its face to be unduly harsh in comparison to the gravity of the offense. Fleming was charged and convicted of severely bludgeoning Keith Nichols with an iron pipe. This is not a case involving, for example, "forty years without parole for what in essence is a petty criminal's stealing of a steak," (Presley, 474 So.2d at 621 (Robertson, J., specially concurring)), or one in which the defendant is subject to a sentence of fifteen years for uttering a forged $250 check (Clowers, 522 So.2d at 763). Secondly, the statutory maximum penalty for aggravated assault is not grossly out of line with the maximum terms allowed for the commission of other violent crimes in Mississippi.[8] Thirdly, the maximum penalties imposed for aggravated assault in neighboring states are not profoundly different from our own.[9] Clearly, Fleming's sentence is not "grossly disproportionate."
The assignment of error must fail.

CONCLUSIONS
None of Fleming's assignments of error merit reversal. We are exceedingly disturbed, however, by the prosecutor's duplicity and defense counsel's unskillful advocacy.
The record clearly reveals that the prosecutor was less than straightforward concerning the role of Tyrone Mitchell, the confidential informant. He first declared that the informant had given no information linking Fleming to the crime. His own witness, however, testified that Fleming was arrested based on information obtained from a confidential informant. Thus forced to adjust his earlier statement, the prosecutor explained that the informant had merely seen Fleming leaving the area and did not witness the crime itself. After the defense had rested, the prosecution called Mitchell, whom Butler's testimony had already identified as the informant, as a rebuttal witness. It became immediately evident that Mitchell had not only seen Fleming "leaving the area," but had actually observed the crime in progress. Mitchell was clearly a material witness, and the prosecution violated the rules of discovery by refusing to disclose him. The defense dropped the ball, however, by failing to object to Mitchell's testimony. We are thus foreclosed from reversing on those grounds.
Unfortunately, several other crucial junctures found Fleming's counsel asleep at the switch. Counsel argues that Miss. Code Ann. § 97-3-7(2) is constitutionally vague, but failed to preserve the issue for appeal. Similarly, counsel maintains that the defense should have had access to Leroy Andrews' written statement, but she failed to *304 object or seek access to the document when the prosecution referred to it at trial. Counsel likewise failed to preserve the propriety of Nichols' in-court identification for purposes of appeal. Counsel moved twice for a speedy trial, but twice confessed a lack of preparation when offered an expedited trial date. Moreover, the defense performed a tremendous favor for the prosecution by voluntarily introducing the hearsay statements of Flavian Gray  the most probative evidence of Fleming's guilt  and by exposing Fleming's two former convictions.
The record before us qualifies as a textbook example of how not to try a case. We deplore the insidious tactics of the prosecution; we lament the ingenuousness of the defense. Given the present posture of the case, however, we have no choice but to affirm.
CONVICTION FOR COUNT I  ROBBERY AND COUNT II  AGGRAVATED ASSAULT AND SENTENCES OF FIFTEEN (15) YEARS ON COUNT I AND TWENTY (20) YEARS ON COUNT II, IN CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, SAID SENTENCES TO RUN CONCURRENTLY WITH SENTENCES IN CAUSE NOS. U-1037, X-455 AND B-622, HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT, AFFIRMED.
ROY NOBLE LEE, C.J., and PRATHER, ROBERTSON, SULLIVAN and BANKS, JJ., concur.
PITTMAN, J., concurs in results only without separate opinion.
HAWKINS, P.J., concurs in results only by separate written opinion joined by DAN M. LEE, P.J.
BANKS, J., concurs by separate written opinion.
HAWKINS, Presiding Justice, concurring in result:
I concur in the result, but do not agree with some of the routes taken by the majority on its journey.
As an instance, in my view proof of Fleming being in the truck during the course of the commission of the crime was strong evidence of participation. Contrary to the majority, it strikes me as being quite unlikely that Fleming as a mere bystander simply entered the truck out of curiosity. (Majority Opinion, p. 288).
DAN M. LEE, P.J., joins this opinion.
BANKS, Justice, concurring:
I agree that this case must be affirmed. I write separately to express my disagreement with Part VII of the majority opinion insofar as it suggests that the identity of a confidential informant should be disclosed, if that informant has knowledge of facts that are material.
Our criminal discovery rule requires the state to disclose the names of witnesses that it will call at trial and those who have knowledge of exculpatory facts. Rule 4.06, Uniform Criminal Rules of Circuit Court (hereinafter Rule 4.06.) Confidential informants, who do not fit these categories, are to be disclosed only if they are "an eye-witness to the event or events constituting the charge against the defendant." Rule 4.06(b)(2).
We have interpreted this provision to exclude, as a subject of disclosure, those informants who witness less than every element of the crime charged. For example, the confidential informant who sets up the drug buy, but is not around for the exchange, is not required to be disclosed despite the fact that the informant was present just before and just after the transaction and obviously has material information. Bradley v. State, 562 So.2d 1276, 1279 (Miss. 1990).
The majority now suggests that a confidential informant, who is a material witness, is subject to disclosure. To be clear, I have no quarrel with the assertion that a witness, who is to be called by the state, is subject to disclosure. Rule 4.06(a)(1). What I take issue with is the requirement that a true confidential informant be made subject to disclosure by virtue of being a material witness, that is, one who has knowledge of "facts of substantial relevance *305 to the matter of whether the accused is guilty" to use the language of a prior pronouncement in dicta on this subject. Ray v. State, 503 So.2d 222, 224 (Miss. 1986).
Virtually every confidential informant has information that is substantially relevant to the question of guilt. Tipsters have hearsay. Confidential informants on the other hand, who have information justifying a warrant or the like, are usually required to have personal knowledge. Often in drug, gang and organized crime activity, they have knowledge of material facts but are not needed to make a case. The majority would require that the names of these individuals be disclosed without regard to the needs of law enforcement or the safety of the individual.
Perhaps our rule would be better, if it required the state to disclose the names of all material witnesses known to it and provided that, upon the appropriate showing by the state, the court could relieve the state of the obligation to disclose the name of any such witness, where disclosure would be detrimental to ongoing investigations or to the health and well-being of the witness. In any event, where the witness is to be called by the state at a trial or hearing or where the witness has exculpatory evidence identification must be disclosed. In amending our rule sub silencio, we do an incomplete job to the detriment of legitimate law enforcement concerns.
In the instant case the majority assumes that the confidential informant testified. If that is so, the informant was subject to disclosure under the explicit language of our rule. If on the other hand, we have an informant who saw no assault or robbery but merely saw the defendant in an inculpatory position after the offense, that informant did not witness the crime charged and is not subject to disclosure within the plain reading of our rules. I would abandon the path cleared in dicta beginning in Ray and continuing through Cummins v. State, 515 So.2d 869, 876 (Miss. 1987), Gowdy v. State, 592 So.2d 29 (Miss. 1991), and more recently Bosarge v. State, 594 So.2d 1143 (Miss. 1991). I would apply our rule as written, until such time as we change its language giving fair consideration to all of the consequences.
NOTES
[1] The thrust of Fleming's May 12 motion to quash supports the state's contention that the first indictment did not contain an aggravated assault count.
[2] The court below properly instructed the jury that "[t]he testimony of an accomplice is to be considered and weighed with great care and caution." The instruction was particularly appropriate here since Gray's statement conflicted somewhat with Andrew's testimony. Gray alleged that Fleming left the "temple" carrying the iron pipe; Andrews testified that the weapon was initially in Gray's possession.
[3] At oral argument, Fleming's counsel stated that she brought up Fleming's prior convictions because she thought the judge had ruled that the convictions would be admissible. The trial court, had instead ruled that the convictions were inadmissible. The attorney explained that she was trying to beat the state to the draw.
[4] The trial court acted pursuant to the pre-1990 version of the Uniform Crim.R.Cir.Ct.Prac., Rule 4.06 which provided for the in camera inspection of witnesses' statements. In 1990, the rule was modified so that statements are now provided directly to the defendant.
[5] Fault for the erroneous ruling must lie with the prosecutor, not the trial judge. If the prosecutor's representations about the confidential informant had been accurate, the ruling would have been proper.
[6] Fleming does not appeal on grounds of the 270 Day Rule since the interval between his May 5, 1988 arraignment and his October 5, 1988 trial is less than 270 days. Delay, for the purposes of the 270 Day Rule, is calculated from the date of arraignment. See Miss. Code Ann. § 99-17-1 (1972).
[7] Since the state bears the risk of non-persuasion, an affirmative demonstration of prejudice is not a necessary element in proving a denial of the constitutional right to a speedy trial. Moore v. Arizona, 414 U.S. 25, 26, 94 S.Ct. 188, 189, 38 L.Ed.2d 183 (1973), cited in Adams, 583 So.2d at 173 (Robertson, J., dissenting). Nevertheless, a failure on the part of the defendant to show positive prejudice prevents the fourth Barker factor from weighing independently against the state. Where the state does not show lack of prejudice, the presumption of prejudice arising under the first Barker factor remains unless overcome by the facts and circumstances pertinent to the other two factors. See Adams, 583 So.2d at 170.
[8] Chapter 97 of the Mississippi Code establishes the following penalties:

capital murder  death or life imprisonment
murder  life imprisonment
manslaughter  20 years
kidnapping  life imprisonment if fixed by jury; 30 years if fixed by court
mayhem  7 years
poisoning  10 years
rape of victim under age 14  death or life imprisonment
statutory rape  5 years
rape with intent to ravish  life imprisonment
robbery  15 years
armed robbery  life imprisonment
sexual battery  30 years
[9] Alabama, like Mississippi, imposes a maximum term of 20 years; Louisiana, 10 years; Tennessee, 10 years; Florida, 15 years.