On August 9, 1989 Johnny Mowdy and Martin Scrivner each pleaded guilty in Warren County Circuit Court to six counts of aggravated assault stemming from a drive-by shooting on May 28, 1989, outside a Vicksburg nightclub. Based on the recommendation of the State, they both were sentenced to the custody of the Department of Corrections for twenty-five years for all charges. They were transported to Parchman Penitentiary promptly after sentencing. *Page 739 
Subsequently, both filed post-conviction relief petitions in the Circuit Court of Warren County contesting the voluntariness of their pleas.
Feeling aggrieved as a result of a summary judgment issued by the circuit judge, Mowdy and Scrivner appeal to this Court, assigning as error the circuit court's grant of summary judgment to the State. We hold that this case is one of those instances where conflicting affidavits do not warrant an evidentiary hearing. The circuit judge correctly entered summary judgment due to the absence of a genuine issue of material fact based on the entirety of the record before the lower court.
 THE FACTS
On May 28, 1989, at approximately 2:10 a.m., several rifle shots were fired from a van into a crowd of people standing outside the Dodge City Lounge in Vicksburg, Mississippi. This "drive-by" shooting resulted in injuries to six people. The occupants of the van were the driver Martin Scrivner, and passengers in the front seat, Rose Marie Hogan and Johnny Mowdy. A Vicksburg police officer stopped the van shortly after the shootings and took all three individuals into custody.
Separate statements were given by each individual. All three statements were initially similar, but subsequently they parted company significantly on several major facts. Mowdy and Scrivner's statements indicated that shortly before the shooting incident, they were with co-defendant Rose Marie Hogan's husband, Danny Hogan, when he attempted to buy "a smoke" from a guy named "Slick" at the Dodge City Lounge. Danny was "ripped off," losing his money, and receiving no drugs in return. To make matters worse, he was beaten unconscious in the process by three subjects. Mowdy and Scrivner carried Danny home to his wife Rose. Mowdy, Scrivner and Rose then drove by the Dodge City Lounge. Mowdy and Scrivner both identified Rose as the "triggerman." Scrivner's statement to police mirrors Mowdy's except that he failed to mention the drugs and never explained why the three of them were at the Dodge City Lounge initially. Scrivner also stated that they had fired the gun used in the shooting earlier that day at Danny's house, and that Mowdy had talked about buying the gun from Danny. Scrivner claimed Rose wanted to go back to Dodge City Lounge to ask the guy why he took Danny's money. Mowdy further claimed that Rose wanted them to take her back by the Dodge City Lounge because, as she stated, "I am going to go and shoot the mother-fuckers, because don't nobody mess with my man or my money." Neither Mowdy nor Scrivner ever explained how Rose ended up with the gun that the three men had been shooting earlier that day. Also, Mowdy never claimed that he discussed buying the gun from Danny.
Rose Marie Hogan stated that Mowdy, Scrivner and her husband, Danny, had been out drinking that night, and when the three returned, Danny asked her to go to the store to get cigarettes for him. He was allegedly unable to get them for himself because he was too intoxicated. She claimed Mowdy and Scrivner went with her because they wanted to see the riverfront in Vicksburg. Rose stated that on the way to the store Scrivner deviated from her instructions and drove by the Dodge City Lounge. She claimed that Mowdy, who was seated next to the window on the front passenger's side, picked up a rifle and began shooting from the moving van as they passed the Dodge City Lounge. If Rose knew of the trio's prior attempt to purchase drugs, she never mentioned it to the police officers.
Scrivner and Mowdy appeared in the Warren County Circuit Court and changed their pleas from not guilty to guilty to the six-count aggravated assault indictment. During the course of questioning by the court, they both responded that they had not been induced to plead guilty by promises or threats from anyone, including their lawyer. The court ultimately accepted their pleas, finding them "intelligently and understandingly made." The State recommended that Mowdy and Scrivner be sentenced to a total of twenty-five years each for all charges. The court accepted that recommendation. They were promptly moved to Parchman to begin serving their sentences. *Page 740 
Scrivner and Mowdy filed a motion for post-conviction relief in April 1991. They contended their defense counsel had rendered ineffective assistance by failing to advise them that they had been incorrectly charged with six counts of "aggravated assault" as accomplices when they should have been charged as "accessor[ies] after the fact." As a second basis for their contention that their guilty pleas were involuntary, Scrivner and Mowdy claimed that their lawyer had made promises to them regarding their incarceration which never came to fruition. They said that, despite the expressed sentencing recommendation from the State, their lawyer had assured them that "they would not serve more than 3 years, and they would remain either at the county jail or a nearby Community Work Center, if they would also agree to testify for the State in the Rosemarie [sic] Hogan trial." Scrivner and Mowdy also made several other allegations of false promises by the lawyer. The petitioners attached a sworn letter from Martin Scrivner's mother dated February 15, 1991. The letter described the discussions Mrs. Scrivner had with Travis Vance, the attorney who represented defendants Martin Scrivner and Johnny Mowdy. The letter stated Travis Vance told Mrs. Scrivner during their first meeting that "he was almost sure that Martin would get some `time', but that he, Travis Vance, could get the charge down to one count of accessory to aggravated assault. That would get the time down to five or ten years." The substance of the affidavit was that the attorneys would attempt to have Mowdy and Scrivner serve their time locally and that they were confident they would succeed, but there was no guarantee.
The State filed its motion for summary judgment, and in support of the motion, the State said:
 The State would show that Petitioners were advised of all their constitutional rights and all possible defenses to the charges. At no time were any promises or guarantees made to Petitioners regarding the outcome of the case if it went to trial or the time that Petitioners could actually be expected to serve if they plead guilty. . . .
 Furthermore, Petitioners stood before the Circuit Court of Warren County on August 9, 1990, and responded to the Court's questions concerning their constitutional rights in regard to entry of a guilty plea. The Court found no reason to stop the proceedings and no objection was voiced by either petitioner.
Affidavits from Travis Vance and Richard Johnson, the two attorneys who represented Mowdy and Scrivner, were secured by the State. Vance stated in part in his affidavit:
 Sometime around May 29, 1989, I first discussed with Johnny Mowdy and Martin Scrivner, in the Warren County jail, the circumstances surrounding the six charges of aggravated assault that were lodged against these two and a third accused, Rosemary Hogan (sic). . . .
 Subsequent to the first meeting with Mowdy and Scrivner, I had several more conversations with them and their family members relative to the charges. I advised them of the possibility of a conflict of interest in the event that the statement of either of them should conflict against the other. We also discussed the possibility of a lesser charge being in order and generally discussed the penalties applicable. I went to the Warren County jail with Mrs. Scrivner, Johnny's mother, and we talked openly about the charges and the possible consequences. We discussed all defenses available to the charges and possible witnesses to what had transpired. I never made any promise or guarantee as to what the ultimate outcome would be to the charges.
 . . . My investigation of this case was thorough and included several [more] conversations and discussions with Mowdy and Scrivner, their family members, the District Attorney, law enforcement personnel and other witnesses. After fully informed plea bargaining discussions with the District Attorney, he was prepared to recommend 25 years on a plea of guilty. This offer was fully and completely explained to Mowdy and Scrivner. At no time did I indicate or promise that they would only serve three (3) years on such a sentence or *Page 741 
that they would remain at the Warren County jail indefinitely after sentence. In fact, they understood that I could make no such promise and that if they did plead guilty the Department of Corrections would make all decisions about service of their sentences. I made no threat to get them to enter their plea and I promised them nothing. Their plea was of their own free and informed volition.
Richard Johnson's affidavit was almost verbatim to Vance's. Johnson stated:
 During the course of my association with Vance, I was present on several occasions with him at the Warren County jail while he discussed the facts of the incident and the circumstances with Mowdy and Scrivner.
 Vance advised them that if either should have a statement that might conflict with the other, then he would have a conflict of interest and could not represent them both. I know of no such circumstance and Vance was employed to represent them in this matter. The facts of the incident were discussed at length on several occasions and Vance informed Mowdy and Scrivner of all their constitutional rights and all possible defenses to the charges and all possible lesser included charges . . .
 At no time do I recall hearing Vance make any promise or guarantee regarding the outcome of the case if it went to trial or the time that they could actually be expected to serve if they plead guilty. I remember that Mowdy and Scrivner would be called as a witness against Hogan and that Vance would see if they could remain in the Warren County jail as long as possible.
Summary judgment in favor of the State was rendered by the trial court. The court's opinion was that there was no "genuine issue of material fact" considering the entirety of the record. The court noted that both Mowdy and Scrivner previously stated to the court under oath that their guilty pleas were being rendered intelligently and voluntarily and that they were not induced by any threats or promises by their attorney or anyone else. Mowdy and Scrivner thereafter perfected an appeal to this court, raising the following issue for review:
 DID THE CIRCUIT COURT ERR IN GRANTING SUMMARY JUDGMENT TO THE STATE ON MOWDY'S AND SCRIVNER'S MOTION FOR VACATION OF THEIR GUILTY PLEAS? DISCUSSION OF LAW
Relying on Herring v. Estelle, 491 F.2d 125 (5th Cir. 1974), Mowdy and Scrivner fault their attorney because they claim he erred in failing to advise them that they had committed only "accessory after the fact," rather than six separate aggravated assaults. Herring held that it is ineffective assistance of counsel to allow a person to plead guilty where the facts indicate that the offense was not committed. Six people were in fact shot with the .22 rifle. Mowdy and Scrivner state simply that they did not do it and only aided Rose in fleeing the scene of the crime after she shot the six people at Dodge City Lounge.
Mowdy and Scrivner assert that they blindly pleaded guilty to an offense they are technically not guilty of under Mississippi law. Mowdy and Scrivner fail to take stock of their situation. Their misconception is based upon the mistaken belief that they are not principals to this crime under their own statements to police. These statements were a part of the record and were available for the lower court's consideration. Mowdy conveniently forgets that in his statement he admitted that Rose told them both she intended to take her gun and shoot somebody when they all went back to Dodge City Lounge. Neither Mowdy nor Scrivner ever indicated they were not going to have anything to do with this, or attempted to talk Rose out of shooting someone. Having been fully advised of her intentions, they proceeded to drive to the Dodge City Lounge. It is evident from the record that Mowdy and Scrivner could not be classified as accessories-after-the-fact as they contend. They were principals under their own stated versions, if taken as true. In a jury trial, Mowdy's own statement would have been tantamount to a confession to being a principal to the aggravated assault. From Rose's position as set forth in her statement they were clearly principals, and, had a jury chosen to *Page 742 
believe Rose's version, there could be no question but that both Mowdy and Scrivner could have been convicted of the six counts of aggravated assault.
Mowdy and Scrivner did not have to fire the gun to be classified as principals to the offense of aggravated assault. This Court in Fleming v. State, 604 So.2d 280, 288 (Miss. 1992), held that any person who aids, counsels, or encourages another person in the commission of a crime is guilty as a principal, as well. Id. at 288. See also, Davis v. State,586 So.2d 817, 821 (Miss. 1991); Sayles v. State, 552 So.2d 1383, 1389 (Miss. 1989).
This Court in Gaskin v. State, 618 So.2d 103, 107 (Miss. 1993), stated:
 Knowledge of the elements is obviously a prerequisite to an intelligent assessment by the defendant of: 1) whether he has in fact done anything wrong under the law, and 2) the likelihood that he stands to be convicted if he exercises his right to a jury trial.
Certainly the Mowdy and Scrivner were entitled to advice enabling them to determine what they did wrong under the law. The affidavits of the two attorneys at the lower court level stated "that the defendants were advised of all of their constitutional rights and possible defenses to the charges. . . . We discussed all defenses available to the charges including the possibility of a lesser charge being in order and generally discussed the penalties applicable." The attorneys at trial level have denied all bases for relief alleged by Mowdy and Scrivner herein.
The facts in the record are not consistent with Mowdy's and Scrivner's allegations and summary judgment is proper. Mowdy and Scrivner argue that Sanders v. State, 440 So.2d 278 (Miss. 1983) applies; however, that case is distinguishable from the case sub judice. In Sanders there were no counter affidavits from the attorneys for that court to consider. The motion in this case was not dismissed on its face, but rather, it was dismissed on the State's motion for summary judgment after the State had filed an answer to the defendant's application for post conviction relief, secured affidavits from the attorneys countering each issue raised by the defendants and the court hadconsidered the entire record. In Carter v. Collins,918 F.2d 1198, 1202 (5th Cir. 1990), that court held that the "state court may evaluate an ineffective assistance of counsel claim by making credibility determinations based on affidavits submitted by the petitioner and the attorney."
Mowdy and Scrivner in asserting ineffective assistance of counsel, must satisfy the two-part test announced in Stricklandv. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which required a showing that (1) "counsel's performance was deficient" and that (2) "the deficient performance prejudiced the defense." Id. at 687, 104 S.Ct. at 2064. "This test applies to guilty pleas based on ineffective assistance of counsel."Hill v. Lockhart, 474 U.S. 52, 58, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985). In Hill, this Court stated:
 In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective assistance challenges to convictions obtained through trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.
Id. at 59-60, 106 S.Ct. at 370. See also, Leatherwood v.State, 539 So.2d 1378, 1381 (Miss. 1989).
Mowdy and Scrivner's claim fails on its face due to their failure to delineate facts which, if proven, would show the likelihood of success at trial. They do not meet the criteria of the Strickland test. *Page 743 
Mowdy and Scrivner further claim their lawyer erred because he made promises which were not kept to them regarding their incarceration and sentence which never came about. They state that they were to have received the benefit of certain promises if they agreed to testify for the State against Rose Hogan. Their lawyers refute these allegations by affidavits. Even if these allegations are taken as true, nothing in the record indicates whether Mowdy and Scrivner ever testified against Rose. Surely if they completed their part of this alleged deal and were double-crossed by the State, they would have said so in their pleadings, affidavits or briefs before this Court. We know that the alleged promise to remain in the county jail was not kept, because both Mowdy and Scrivner were promptly moved to Parchman where they still reside. The facts indicate the implausibility of the deal's occurring as Mowdy and Scrivner maintain.
Martin Scrivner's mother, Ruby Scrivner, supplied an affidavit which fails to support the appellants' allegations. Ms. Scrivner was not privy to any of the conversations regarding the guilty pleas.
Apparently, the trial judge placed great emphasis on the appellants having represented under oath before him during the entry of their guilty pleas and sentencing that they had not been induced to plead guilty by promises from anyone. This Court inBaker v. State, 358 So.2d 401, 403 (Miss. 1978) stated:
 We are mindful, as stated in Blackledge v. Allison
[431 U.S. 63, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977)], that "Solemn declarations in open court carry a strong presumption of verity." The state, the defendant, and the judicial system all have a significant interest in the plea. For the defendant, if guilty, he can begin serving his sentence without facing the delay and agony of a futile trial. Time is conserved for the state prosecutor and an already crowded court system is spared an unnecessary burden. Balanced against these administrative interests of course is the interest of protecting constitutional rights, particularly in the criminal law area.
The trial court is right to place great emphasis upon these statements under oath made by Mowdy and Scrivner in open court during the taking of their guilty pleas and sentencing. There should be a strong presumption of validity of anyone's statement under oath. However, we are now faced with one statement or the other not being the truth. The trial judge faced this same dilemma, obviously calling into question the appellants' credibility. This Court in Harris v. State, 578 So.2d 617, 620 (Miss. 1991), held "that not all instances of conflicting affidavits will merit an evidentiary hearing. Where the petitioner's version is belied by previous sworn testimony, for example, as to render his affidavit a sham we will allow summary judgment to stand." If ever there was a sham, it is clearly within these allegations through which Mowdy and Scrivner attempt to get this Court to order an evidentiary hearing to set aside validly imposed sentences based upon what they both now claim were involuntary pleas.
In considering their pleas of guilt, the trial court required the State to place in the record, in the presence of both Mowdy and Scrivner, the recommendation of sentences of 25 years in the custody of the State Department of Corrections for six aggravated assault convictions. Although they both claim their lawyer told them they would get 3 years, they clearly knew the State's recommendation would be 25 years. The judge further stated to both defendants that he could give them up to a maximum of 120 years and asked if they understood. Both stated they did understand that 120 years was the maximum sentence they could receive. There can be no doubt that Mowdy and Scrivner each knew that the judge intended his sentence to be 25 years.
The judge further advised both Mowdy and Scrivner of one aspect of criminal law that most defendants and some lawyers tend to forget — that he was not bound to accept the recommendation of the State in the plea bargain agreement. Judge Patrick then asked, "Knowing these things, are you still sure that you want to plead guilty?" Both Mowdy and Scrivner maintained they still wanted to plead guilty. Both Mowdy and *Page 744 
Scrivner repeatedly answered in response to questions by the trial judge, that they were pleading guilty freely, voluntarily, and without force, threat, or promise from any source, including their attorney. Both indicated they understood that they were pleading guilty to shooting six people. They told the court they were advised of all constitutional rights and were satisfied with their attorney's services. What is crystal clear from all this is that these two defendants expected to and did receive a 25 year sentence. They should not now be allowed a hearing in an attempt to avoid pleas of guilt for which they voluntarily bargained.
The affidavits of Mowdy and Scrivner were countered by the attorneys to the satisfaction of the trial judge. We should defer to the trial judge who was there, saw these two defendants, observed their demeanor, and heard what they said.
Regarding the question of where these sentences were to be served, Mowdy and Scrivner were clearly informed about the location by the trial judge when he stated
 In the future, you'll be — when you get out — you'll be welcome to come to Warren County without any gunplay. . . . I would like to caution you, also, that once you get to Parchman that you are going to be tested. . . . If you get up there and don't follow the rules while you are there, you may end up spending this whole 25 years up there.
Can there be any doubt that these defendants knew that they were not going to be spending time in the Warren County Jail, but rather would serve their sentence at Parchman?
 CONCLUSION
The Warren County Circuit Court correctly entered summary judgment. No genuine issue of material fact existed before the court based on the entirety of the record. The conflicting affidavits do not warrant an evidentiary hearing. Mowdy and Scrivner's prior pleas under oath before the same trial judge weighed heavily against their credibility when they once again, under oath, reappeared seeking to vacate their former sentences. We hold the issue raised to be totally without merit. Accordingly, the decision of the circuit court is affirmed.
DENIAL OF POST-CONVICTION RELIEF AFFIRMED.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and JAMES L. ROBERTS, Jr., J., concur.
BANKS, J., dissents with separate written opinion joined by SULLIVAN, PITTMAN and McRAE, JJ.