## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-CA-00404-SCT

*COOPER TIRE AND RUBBER COMPANY*

*v.*

*TRUDYS TUCKIER, INDIVIDUALLY, AND AS ADMINISTRATRIX OF THE ESTATE OF LAURA DAWN TUCKIER, DECEASED, AND AS REPRESENTATIVE OF THE WRONGFUL DEATH BENEFICIARIES*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/17/1999 |
| TRIAL JUDGE: | HON. GEORGE C. CARLSON, JR. |
| COURT FROM WHICH APPEALED: | PANOLA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | SAM E. SCOTT |
| | KEITH R. RAULSTON |
| | VIRGINIA McBRYDE TODD |
| ATTORNEYS FOR APPELLEE: | D. BRIGGS SMITH |
| | CLYDE TAB TURNER |
| | MICHAEL DALE COOKE |
| NATURE OF THE CASE: | CIVIL -WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED - 01/10/2002 |
| MOTION FOR REHEARING FILED: | 1/24/2002; denied 4/4/2002 |
| MANDATE ISSUED: | 10/14/2002 |

**EN BANC.**

**McRAE, PRESIDING JUSTICE, FOR THE COURT:**

¶1. On October 13, 1995, Laura Dawn Tuckier ("Laura") was killed when her Bronco II sport-utility-vehicle rolled over and crashed. Following this accident, it was determined that one of Laura's tires had separated and that this tire had been manufactured by Cooper Tire and Rubber Company, Inc. ("Cooper"). Further, Cooper used "bad stock" which can cause the tread to separate because of the improper bonding of the tire and tread. Laura's wrongful death beneficiaries, her father, mother, and brother ("Tuckiers"), brought suit against a number of defendants. However, the only remaining defendant at trial and on appeal is Cooper. Cooper raises several issues for review which are summarized as follows: whether the trial court should have granted a directed verdict for Cooper because the Tuckiers failed to prove a prima facie case under the Mississippi Products Liability Act (MPLA); whether certain evidence admitted and arguments presented by the Tuckiers constitute reversible error; whether the compensatory damages award was proper; and whether the punitive damages award was proper. Finding no error, we affirm the trial court.

## FACTS

¶2. On October 13, 1995, Laura's Bronco II's rear tire tread separated and caused her to lose control and crash, and subsequently Laura died. This tire was manufactured by Cooper Tire and Rubber Company, Inc. ("Cooper"). On May 27, 1997, Laura's wrongful death beneficiaries ("Tuckiers") filed suit against several defendants, including Ford Motor Company, the manufacturer of the Bronco; Johnny Ray Works, the seller of the vehicle; Cooper , manufacturer of the subject tire; and Dillard Lowery d/b/a/ Auto Specialists, who sold the tires to Laura's father. Cooper ("Cooper") was the only remaining defendant at trial and on appeal. The claims against the other defendants were settled prior to trial. However, the jury apportioned fault to Ford Motor Company in its verdict.

¶3. Eyewitnesses to the accident testified that Laura's Bronco moved into the left lane of traffic, immediately back to the right and then began to flip and continued to flip until it was off the interstate. There was no swerving of the vehicle from left to right, but the vehicle made a sharp turn to the right and then flipped off the highway. An eyewitness further testified that she noticed nothing wrong with the vehicle until she noticed dust and dirt coming from under the left tire.

¶4. The Tuckiers' expert witness, Max Nonnamaker ("Nonnamaker"), testified that his examination of the tire indicated that Laura had no notice or warning that something was wrong with the tire. The primary reason for this lack of warning was the steel belts of the tires. Because the tire separation was between the steel belts, the outer steel belt was still stiff, and Laura probably would not have heard anything. Nonnamaker further testified that the tire separation was not due to operating conditions and that the separation would have created a "real vehicle handling control problem."

¶5. In November 1999, the trial was held in the Circuit Court of Panola County. The verdict apportioned fault to the parties as follows: Lawrence Tuckier (Laura's father), 0%; Laura Tuckier, 2%; Johnny Ray Works, 0%; Dillard Lowery, d/b/a/ Auto Specialists, 0%; Ford Motor Company, 30%; and Cooper Tire, 68%.

¶6. The jury awarded the Tuckiers compensatory damages in the amount of $485,000.00, $329,000.00 to be paid by Cooper. The jury also awarded the Tuckiers $3 million in punitive damages to be paid by Cooper. Aggrieved, Cooper now appeals.

## STANDARD OF REVIEW

¶7. When reviewing the denial of a directed verdict, the Court considers the evidence in the light most favorable to the appellee, giving the appellee the benefit of all favorable inferences that may be drawn from the evidence. If the facts point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. However, if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required. ***Sentinel Indus. Contracting Corp. v. Kimmins Indus. Serv. Corp.***, 743 So. 2d 954, 960 (Miss. 1999). The standard of review for denial of a motion for mistrial is abuse of discretion by the trial court. ***Bass v. State***, 597 So. 2d 182, 191 (Miss. 1992).

## LAW

**I. WHETHER THE TRIAL COURT SHOULD HAVE GRANTED A DIRECTED VERDICT FOR COOPER BECAUSE THE TUCKIERS FAILED TO PROVE A PRIMA FACIE CASE UNDER THE MISSISSIPPI PRODUCT LIABILITY ACT (MPLA).**

¶8. Cooper complains that the Tuckiers did not establish a prima facie case under the Mississippi Products Liability Act ("MPLA"), Miss. Code Ann. § 11-1-63(a)(i)(1) (Supp. 2001). While the Tuckiers assert that the use of bad stock in the manufacturing process led to Laura's accident and subsequent death, Cooper states this argument fails due to the fact that the Tuckiers did not set forth Cooper's specifications for the manufacture of its tires and make appropriate comparisons with the relevant factors in this case. Cooper also asserts that the Tuckiers did not successfully prove a case of negligence against it. The Tuckiers did make a prima facie case under the MPLA by asserting that Cooper did in fact use bad stock in the manufacturing of its tires and that under the MPLA, a products liability act, proof of a negligence case is not necessary.

¶9. Miss. Code Ann. § 11-1-63(a)(i)(1) (Supp. 2001) , states:

> In any action for damages caused by a product except for commercial damage to the product itself:
>
> (a) The manufacturer or seller of the product shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller:
>
> (i)1. The product was defective because it deviated in a material way from the manufacturer's specifications or from otherwise identical units manufactured to the same manufacturing specifications;
> ....

¶10. Cooper refers to the analogy of the recipe for a cake, arguing that, "if the cake tastes bad, one must examine the recipe in order to determine whether the baker failed to follow the recipe." While the Tuckiers state that if the ingredients are bad, whether the recipe was followed is irrelevant. The Tuckiers did meet their burden of proof when they put on expert testimony that the subject tire did in fact fail due to the use of bad stock, which in turn failed to create a chemical bond in the tire. The Tuckiers also presented supporting testimony from two Cooper employees who stated bad stock was knowingly and intentionally used in tire manufacturing by Cooper. The Tuckiers put on sufficient proof to uphold the jury verdict, and the trial court did not err by denying Cooper's motion for directed verdict.

¶11. The Tuckiers called as their expert witness, Max Nonnamaker ("Nonnamaker"), an expert in the field of tire manufacturing, who had analyzed over 3,000 tires, including hundreds of radial tires during his twenty-six-year career. Nonnamaker stated that he made an independent examination of the subject tire and did not base his findings upon the testimony of former employees Jimmy Oats and Richard Angell, as Cooper suggests.

¶12. Nonnamaker completed an independent forensic examination of the tire, and he explained his procedure while testifying. When asked to explain what he looked for in examining a tire such as the subject tire, Nonnamaker stated,

> We look at everything. In other words, the first thing that I do is I take the unit and look at it very carefully at all of the exposed areas. Then I go back and record on a sheet the markings that are present and the conditions by documenting what their location is on the tire, and then I finish up by

taking photographs to document those conditions.... We look for everything, and then we interpret whatever we find. And not only do we interpret what we find, but it also has to be consistent with what is present in the balance of the tire in the wheel. In other words, you just can't pick out one area and say this is so and so, or you can say that, but you would then be overlooking how it ties in with the balance of the tire. So everything about the tire is significant. It's just a matter of-It's like running an autopsy on a person. It's the same thing.

¶13. Nonnamaker further stated that he had found a large area where the tire actually separated and that there was a breakdown in the rubber between the two steel belts in this area. He found a similar area on the opposite side of the tire and stated that the fact that the breakdown appears on opposite sides of the tire indicates that it was due to something built into the tire, rather than operating conditions. He further testified that the tire peeled and ripped apart due to the stock that was used to build the tire. Although the tire had bonded mechanically, it had not bonded chemically due to the bad stock used by Cooper in the manufacturing process.

¶14. Nonnamaker's testimony refuted Cooper's assertion that the tire had been allowed to run after it was torn by road damage. Nonnamaker did not find that the tire had been over-inflated or under-inflated, and he found no evidence of a cut that would explain why the tire had peeled apart. He also found that the inner steel belt had not been penetrated and that if it had, he would have expected to have seen the tire cut in a centralized location, but he did not find this during his examination.

¶15. Cooper asserts that because Laura's Bronco was towed to a service station following the accident and because the tire was not deflated, the tire was not mismanufactured, but was damaged by road debris. Nonnamaker also provided testimony to refute this assertion when he observed the tire pressure. After receiving the tire for inspection, Nonnamaker observed the tire pressure was 42 pounds. When he checked the pressure again, some 42-52 days later, he found the pressure had decreased by one pound, which he stated was a normal occurrence. This led Nonnamaker to conclude that the tire had not been damaged or punctured from something outside the tire, as the tire still retained pressure, but that the tire had been damaged from an element inside the tire. This also led him to the conclusion that bad stock had been used in the manufacture of this tire.

¶16. Cooper faults Nonnamaker's testimony because he did not perform a chemical test of the subject tire to determine whether old stock was in fact used in the manufacturing of this tire. However, Cooper also produced a witness who testified about his tests for tire inspection, which were quite similar to the tests done by Nonnamaker and who also did no chemical test. In addition, Nonnamaker's testimony is supported by two witnesses, who were former employees of Cooper.

¶17. Cooper criticizes Nonnamaker's testimony because Nonnamaker did not perform any chemical tests of the subject tire. The Tuckiers stated that no back-tests of the tire could be performed after the tire had been made. At oral argument before this Court, counsel for Cooper admitted that there could be no chemical tests of the tire after it had been formed, and this agrees with the statements made by the Tuckiers. No chemical tests or "back-testing" of the tire could be performed after the tire had been made.[1]

¶18. Nonnamaker also testified that by looking at the Department of Transportation number on the tire, he could identify the date the tire was manufactured and that it came from the Cooper Texarkana plant. He testified that the tire was manufactured in the fourth week of January 1992, a period following a holiday shut-down of the plant where stock was allowed to sit, and this further supported his assertion that the tire

had been manufactured with bad stock.

¶19. Cooper bases the majority of its argument on this issue upon the credibility of two witnesses presented by the Tuckiers, Jimmy Oats and Richard Angell. Cooper states that the testimony of both of these witnesses should not have been allowed because neither had personal knowledge of tire manufacturing at the plant when the subject tire was manufactured in January 1992. However, Oats and Angell both testified that based upon their long-time employment with Cooper, both had personal knowledge of the use of bad stock in the tires. Cooper presented witnesses who testified that this bad stock would have been used by the company prior to the fourth week in January. Cooper also thoroughly cross-examined Oats and Angell as to the status of their employment at the plant in 1992 and about grievances each had filed with Cooper. However, the jury believed the testimony of the Tuckiers' witnesses. The Tuckiers did put on a prima facie case, and this issue is affirmed.

## II. WHETHER CERTAIN EVIDENCE ADMITTED AND ARGUMENTS PRESENTED BY TUCKIER CONSTITUTE REVERSIBLE ERROR.

¶20. Cooper presents this issue in terms of four sub-issues, which are A.) plaintiffs' witnesses were invited to make improper references to religious belief to enhance their credibility; B.) plaintiffs presented false, irrelevant, and prejudicial references to other claims against Cooper; C.) plaintiffs improperly criticized Cooper's objections to discovery; and D.) plaintiffs presented the opinion of an expert who was not called as a witness, thereby placing before the jury matters not in evidence. Cooper also made four motions for mistrial during the course of this trial, three of which were based upon the above mentioned sub-issues or combinations of these sub-issues.

### A.) Plaintiffs' witnesses were invited to make improper references to religious belief to enhance their credibility.

¶21. The Tuckiers called two former Cooper employees to the stand and questioned each about their motives for testifying in this case. On direct examination of witness Jimmy Oats, counsel for the Tuckiers asked, "point-blank what brings you all the way to Batesville, Mississippi, to testify in a case that involves people that you don't even know?" Over defense counsel's objection, Oats answered,

> Well, I don't-I understand that I can't live with myself if I don't tell the truth and don't try to do what I think the Lord would have me do, and I think the Lord wants me to tell the truth and be honest about what I do and the way I live my life. And I don't-I'm sorry. I don't think He would like for me to let things go and not stand up for what I know is right and what I believe is right without being punished for it.

¶22. Another former employee, Richard Angell, was similarly questioned on re-direct examination when counsel asked, "And why are you here testifying?" Angell's response was, "it's just too few a people that are brave enough to do it, I guess. I just felt like it was a Christian responsibility." Cooper did not object to this exchange.

¶23. Cooper objects to these questions and answers stating that they were in violation of M.R.E. 610 on religious beliefs and opinions, which states, "evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature his credibility is impaired or enhanced." However, the comment to Rule 610 states, "this rule prohibits impeaching a witness by

questioning him concerning his religious beliefs and opinions. It does not prohibit questioning him as to those beliefs and opinions when testing his bias or interest."

¶24. Cooper argues that these questions were asked in order to bolster the witnesses credibility, which would be in violation of the rules of evidence, *i.e.*, M.R.E. 608(a). However, Cooper attempted to discredit these witnesses as early as its opening statement, when it described the witnesses as disgruntled employees who were motivated by animosity for Cooper. In Cooper's opening statement, it stated that Oats and Angell had filed many grievances with Cooper while employed because they became dissatisfied with the discipline or money they were receiving from the company. Cooper also stated that Oats and Angell did not file grievances concerning the tires made nor their components. Therefore, from the beginning, Cooper presented their two former employees to the jury as ones testifying because of animosity towards Cooper and therefore "opened the door".

¶25. It is clear from the record that the Tuckiers questioned their witnesses for the purposes of establishing their motives for testifying in this matter and for rebutting the purported motives presented to the jury during Cooper's opening statement. Therefore, the Tuckiers were not acting in violation of Rule 610 on religious beliefs, and the trial court properly allowed these questions and the witness responses. The Tuckiers did not ask their witnesses specifically about their religious beliefs or opinions, but simply their motivations for testifying. The trial court is affirmed as to this sub-issue.

### B.) Plaintiffs presented false, irrelevant, and prejudicial references to other claims against Cooper.

¶26. Cooper cross-examined the Tuckiers' expert witness, Max Nonnamaker, as to his prior testimony in other cases. On re-direct examination, the Tuckiers attempted to rehabilitate Nonnamaker by questioning him as to his familiarity and involvement in other cases. Cooper contends that the Tuckiers violated a pre-trial order that required the Tuckiers to approach the bench and lay a foundation showing substantial similarity of other accidents prior to introduction of these accidents before the jury. However, Cooper opened the door for these questions when it cross-examined Nonnamaker and questioned him as to his involvement in prior cases. Cooper argues that although it did question Nonnamaker as to his previous experiences in testifying the Tuckiers went beyond the scope of this cross-examination by questioning Nonnamaker about other cases where victims were injured as a result of a tire separation.

¶27. Cooper summarizes its position clearly, as it states in its brief, "As is apparent from the questions and their context, the purpose of these questions was to impeach Mr. Nonnamaker by showing the following: he had an ongoing professional relationship with plaintiffs' counsel; he invariably found tires defective; a trial judge once characterized his testimony as completely incredible; his work is overwhelmingly for plaintiffs, rather than manufacturers; in one case plaintiffs' counsel authored his report; and two courts have excluded his testimony as not qualified." The Tuckiers' re-direct of Nonnamaker was as follows.

Q. ...Do you recall whether one of those, the Cleghorn tire, involved people, in fact, there were two people killed, and it involved a tire made in the Texarkana plant of Cooper Tire?"

A. Yes, sir.

Mr. Raulston: Objection, Your Honor. Object and move to strike and ask the jury be instructed to disregard it. He's trying a case within a case.

Mr. Turner: He opened the door.

The Court: Overruled.

Mr. Turner: Thank you.

Q. (By Mr. Turner) Do you recall a case called *Swank v. Ford*?

A. Yes, sir.

Q. And do you recall that Cooper was likewise involved in that case?

A. I don't recall who the manufacturer was.

Q. Do you recall another case involving Cooper Tire from Texarkana that involved a tire that failed from this same time period involving a little boy that was 12 years old that ended up with severe brain damage because of one of the tires?"

A. Yes, sir.

Q. And do you recall that that tire was likewise manufactured defectively?

A. Yes, sir.

Q. And do you recall whether or not Cooper settled that case?

A. Yes, sir.

Mr. Raulston: Your Honor, same objection.

The Court: It will be noted for the record. It will be overruled.

Q. (By Mr Turner) Now, do you recall a case called *Walsh*, versus a variety of defendants?

A. No, I don't.

Q. Do you recall whether the *Walsh* case involved a young college student paralyzed from the neck down because of a Cooper tire made in Texarkana.

Mr. Raulston: Your Honor, he's already said he didn't recall. It's improper leading of a witness. He's trying to testify. The witness said he didn't recall the case.

Mr. Turner: He opened the door to this.

The Court: Okay. The witness can recall. If he doesn't, that's fine, but I overrule the objection.

Q. (By Mr. Turner) Do you recall?

A. Yes, I do.

¶28. Cooper contends that the *Swank* case, the twelve-year-old boy case, and the *Walsh* cases are irrelevant and beyond the scope of re-direct examination because the *Swank* case is "absolute fiction," the

twelve-year-old boy case was the ***Mariona*** case**,** in which the tire was not the same as the subject tire and was not manufactured in 1992, and that the ***Walsh*** case was apparently a Georgia case involving a tire not manufactured in Texarkana and not similar to the Tuckier tire.[(2)] However, the ***Swank*** case was first mentioned by Cooper in its direct examination of Nonnamaker, so Cooper contradicts itself by calling the case fiction. Cooper's basic argument is that if Cooper did in fact open the door to these cases when attacking the credibility of Nonnamaker, then the Tuckiers went beyond the scope of this door-opening by asking questions that implied Cooper's guilt in other prior cases. Cooper also asserts that regardless of the intent of this questioning, these questions are still subject to M.R.E. 403, the rule which allows the trial court to balance the undue prejudice versus probative value of the admitted evidence.

¶29. This line of questioning does not constitute reversible error. In ***Fleming v. State,*** 604 So. 2d 280, 291 (Miss. 1992), we have "[C]learly held, however, that once the defense opens the door to otherwise improper testimony, the prosecution is permitted to enter and develop the matter in greater detail." When the defense presents evidence helpful to its case, the adverse side is presented with an opportunity to rebut the evidence and the defendant's theory. By undertaking such an effort, the defense has sufficiently opened the door to evidence that might otherwise have been inadmissible due to relevance and the lack of probative value. ***Eakes v. State***, 665 So. 2d 852, 868 (Miss. 1995).

¶30. In ***Florence v. State***, 755 So. 2d 1065, 1070 (Miss. 2000), the defendant was charged with sexual battery and aggravated assault and filed a motion in limine to exclude several magazines and videotapes, which the State intended to introduce as being illustrative of homosexual tendencies. We found that Florence had opened the door to this evidence during his opening statement and also during testimony which put the issue of his homosexuality in question. Although Florence argued that the evidence was inadmissible because they were not a part of the res gestae of the crime, we held that the trial court did not err by allowing the magazines and tapes into evidence.

¶31. Cooper opened the door to this testimony when it attacked the credibility of the Tuckiers' expert on cross-examination. In addition, the judge gave a cautionary instruction to the jury to disregard all evidence of prior cases in which Cooper was involved. Instruction C-12 stated that, "you cannot and must not consider this evidence of other alleged claims as substantive evidence on the issue of whether Cooper is responsible for the accident involved in the case before you today." We presume that the jurors follow the instructions as given to them by the trial judge, as upon their oaths, they are required to do so. ***Fielder v. Magnolia Beverage Co.***, 757 So. 2d 925, 937 (Miss. 1999).

¶32. In light of the fact that Cooper is also challenging the denial of its directed verdict, and in finding that the evidence presented was sufficient to uphold the jury verdict, the Tuckiers' re-direct examination of its witness does not constitute reversible error, and this issue is without merit.

### C.) Plaintiffs improperly criticized Cooper Tire's discovery objections.

¶33. The heart of this sub-issue is that the Tuckiers made reference to a quality assurance manual ("manual") , that had been entered into evidence with several pages that were blank. The Tuckiers allege nearly 90% of the pages were blank, meaning that the information on those pages had either been deleted or "whited-out." Cooper asserts that these pages contained confidential product information and that pursuant to M.R.C.P. 26(d), it was allowed to protect this confidential information. Cooper further asserts that the Tuckiers should not have been allowed to make reference to the blank pages in this manual because they failed to object to the form of the manual or file a motion to compel this information during the discovery

process.

¶34. However, this manual was offered into evidence by the Tuckiers without any objection from Cooper, during the Tuckiers' cross-examination of Cooper employee Larry Dowd ("Dowd"). Dowd identified the manual and stated on cross-examination that the manual had, "lots of blank pages in here so it's different. I mean it's difficult to tell if this is the manual I use or not." Dowd further stated, "from the pieces that are here, yes, it looks like pieces of mine." The Tuckiers had every right to question witnesses about this item of evidence.

¶35. The manual was admitted into evidence, and the Tuckiers should be allowed to question witnesses because the manual was relevant evidence. As the Tuckiers point out, the quality of the Cooper tire was at issue and one of the purposes for introducing the manual was to show the jury the quality requirements as set forth by Cooper, so that those requirements could be compared to the subject tire. The trial court did not err by allowing the Tuckiers to refer to the blank pages in this manual.

¶36. The manual was relevant evidence pursuant to M.R.E. 401, 402, & 403. M.R.E. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The quality of Cooper's tire was of "consequence to the determination of the action." The standard of review for denial of a motion for mistrial is whether the trial court abused its discretion. The trial court did not abuse its discretion by allowing the Tuckiers to refer to the blank pages in this manual.

### D.) Plaintiffs presented an expert opinion that was outside the record.

¶37. Cooper further asserts reversible error occurred when the Tuckiers made reference to an x-ray report that examined the remaining three tires on Laura's Bronco. This report was prepared by H. B. Baumgardner, an expert retained by the Tuckiers but not called as a witness. The trial court granted Cooper's pre-trial motion to exclude this evidence. Cooper questioned the Tuckiers' expert, Nonnamaker, on cross-examination, about his examination of these other three tires, and the Tuckiers questioned Nonnamaker in their re-direct about the x-rays of the tires that had been made.

¶38. Cooper cross-examined Nonnamaker whether he ever had the other three tires in his possession to inspect and whether he ever looked at the other tires. Nonnamaker answered negatively to both of these questions. Nonnamaker testified on re-direct, over Cooper's objections, that the x-rays had shown that two of the three remaining tires on Laura's Bronco had belted separations, that could have come to fruition and resulted in another one of Laura's tires separating within the next two weeks of when the accident occurred.

¶39. Cooper's objections to the mention of these x-rays was overruled by the trial court, and this was not an abuse of its discretion. Cooper's cross-examination was clearly aimed at destroying the credibility of the Tuckiers' expert witness, by showing that the other three tires had not been personally inspected by him. However, Nonnamaker testified that he had examined the x-rays of the remaining three tires and that two of them showed belted separations within the tire. This is relevant evidence for the jury to consider, and it was appropriate re-direct examination by the Tuckiers. The credibility of its witness had been lessened by Cooper, and the Tuckiers attempted to rehabilitate their witness by showing that he had in fact examined the other three tires through the use of x-rays, even though he had not physically seen the tires. The admission of the x-ray evidence was relevant and despite the pre-trial motions, the trial court did not abuse its discretion by allowing it. The trial court is affirmed.

## III. WHETHER THE COMPENSATORY DAMAGES AWARD WAS PROPER.

¶40. The Tuckiers were awarded $485,000.00 in compensatory damages, $329,000.00 of which was apportioned to Cooper. In a similar case, *General Motors Corp. v. Jackson*, 636 So. 2d 310, 311 (Miss. 1992), we upheld a compensatory damage award of $7.15 million.

¶41. In *Jackson*, there was also a battle of the experts between the parties, with one expert asserting that the accident was caused by a defective rear axle and the other testifying that the impact of the crash caused the axle to break. Based upon the testimony of Oats, Angell, and the Tuckiers' expert witness, Nonnamaker, we find that the award of compensatory damages is proper, and the trial court is affirmed.

## IV. WHETHER THE PUNITIVE DAMAGES AWARD WAS PROPER.

¶42. Miss. Code Ann. § 11-1-65 (Supp. 2001), the punitive damages statute, sets forth factors to be considered. These factors are: 1) whether there is a reasonable relationship between the punitive damage award and the harm likely to result from the defendant's conduct as well as the harm that actually occurred; 2) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct; 3) the financial condition and net worth of the defendant; and 4) in mitigation, the imposition of criminal sanctions on the defendant for its conduct and the existence of other civil awards against the defendant for the same conduct. The trial court gave a jury instruction tailored to these factors.

¶43. Mississippi's punitive damages statute, § 11-1-65(1)(a), also states:

> Punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud.

¶44. The Tuckiers met this burden of proof through the testimony of Oats and Angell who stated that in the course of their many years of employment with Cooper, they had personal knowledge that bad stock had been used in the manufacture of tires. Cooper thoroughly cross-examined Oats and Angell about the status of their employment when the tire was made in 1992 and about their complaints and grievances with the company over many years of employment. Despite this testimony and questioning, the jury found the Tuckiers' witnesses and testimony to be more persuasive and more credible.

¶45. The Tuckiers' witnesses provided the knowledge requirement of the punitive damages statute. If Cooper knew that it was using bad stock to manufacture a product that would be distributed into the stream of commerce and that the general public relied on that product as a safety product, then Cooper would be liable for punitive damages. Cooper admitted during oral arguments before this Court that if it knew bad stock was being used and that this bad stock could cause a separation, then this would be a safety factor. The testimony provided by the Tuckiers' witnesses and the verdict of the jury giving weight to this testimony provided the necessary requirement of knowledge that allowed this issue to be considered by the jury.

¶46. In this case, the Tuckiers presented three witnesses who testified that Cooper used bad stock in manufacturing its tires. The Tuckiers proved at least "willful, wanton or reckless disregard" for the safety of

others through this testimony of witnesses that the jury found to be credible. Therefore, punitive damages should have been considered by the jury in this case. The Tuckiers also showed the reprehensible behavior of Cooper when they showed that Cooper knowingly used bad stock in the manufacture of its tires.

¶47. Cooper relies heavily on the assertion that only this one tire, the subject tire, was found to be defective out of the 66,000 tires produced by Cooper that year. However, that ratio is not one of the criteria for determining whether punitive damages should have been allowed in this matter. What is important is the reprehensibility of Cooper's conduct. When this one defective tire results in a person's death, there is sufficient evidence to establish this requirement.

¶48. The ratio between the punitive damages award and the actual harm to the plaintiff, was also supported by sufficient evidence. The jury returned a verdict awarding total compensatory damages to the Tuckiers for $485,000.00, $329,000.00 of which was apportioned to Cooper. Following the subsequent punitive damages stage of the trial, the jury awarded the Tuckiers $3 million in punitive damages. Although, this punitive damages award was nearly ten times the compensatory damages award against Cooper, this ratio is acceptable under the Miss. Code Ann. § 11-1-65 (1)(f) factors, which include the financial condition and net worth of the defendant. On appeal, an award will be disturbed only where it is so excessive that it evinces passion, bias and prejudice on the part of the jury so as to shock the conscience of the court. *Valley Forge Ins. Co./CNA Ins. Co. v. Strickland*, 620 So. 2d 535, 541 (Miss. 1993) (citing *Andrew Jackson Life Ins. Co. v. Williams*, 566 So.2d 1172, 1190 (Miss. 1990)); *Banker's Life & Cas. Co. v. Crenshaw*, 483 So.2d 254, 278 (Miss. 1985)). A simple mathematical formula cannot be used to determine whether this punitive damage award is excessive or constitutional.

¶49. Punitive damages have been upheld by this Court in cases where the conduct by the defendant was far less egregious than in this matter. In a case concerning a defendant insurance company's subrogation claims, a punitive damages award of 1.5% of the defendant's net worth was upheld. *Valley Forge*, 620 So. 2d at 541(citing *Andrew Jackson*, 566 So. 2d at 1191 (affirming a punitive damages award of 5.25% of the defendant's net worth)).

¶50. In *BMW of North Am., Inc. v. Gore*, 517 U.S. 559, 116 S. Ct. 1589, 134 L.Ed.2d 809 (1996), the Court held that where Gore had only suffered economic damages and his punitive damages award was 500 times the amount of his actual damages, his award was clearly outside the acceptable range of awards. Comparing this situation with another matter, we have upheld that punitive damage awards equaling 150 times and 43 times the amount of actual damages. *Paracelsus Health Care Corp. v. Willard*, 754 So. 2d 437, 445 (Miss. 1999).

¶51. The parties' attorneys in this matter had stipulated that Cooper's net worth was $947,000,505.00. An award of $3 million dollars represents less than one percent of Cooper's net worth. The Tuckiers' punitive damage award was not excessive and is therefore affirmed.

<u>CONCLUSION</u>

¶52. For the above reasons we affirm the jury and trial court's judgment.

¶53. **AFFIRMED.**

**WALLER, DIAZ, EASLEY AND GRAVES, JJ., CONCUR. SMITH, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY PITTMAN, C.J., AND COBB, J.**

**CARLSON, NOT PARTICIPATING.**

**SMITH, PRESIDING JUSTICE, DISSENTING:**

¶54. In my view, the majority errs in holding that the Tuckiers made a prima facie case under the Mississippi Products Liability Act (MPLA) by asserting that Cooper used "bad stock" in the manufacture of the subject tire. The repeated reference by the majority and by the Tuckiers to the materials used by Cooper in the construction of its tires as "bad stock" inappropriately weights the issue before us. Repeated use of the words "bad stock" amounts to nothing short of buzz words and has nothing to do with the real issue here.

¶55. The primary issue before this Court is whether the Tuckiers met their burden of showing that Cooper's tires were defective when manufactured and/or that Cooper was negligent in the manufacturing of its tires. If the Tuckiers failed to meet their burden on either the defect claim or the negligence claim, directed verdict was proper as to that claim. In my view, the Tuckiers failed to make a prima facie case as to either the defect claim or the negligence claim. Therefore, I believe that the trial court's denial of Cooper's motion for directed verdict was improper. Accordingly, I respectfully dissent.

## I. MANUFACTURING DEFECT

¶56. Prior to trial, the Tuckiers narrowed their product defect claims against Cooper to one theory of defect -- mismanufacture. They claimed that the use of old rubber stock in making the tire constituted a manufacturing defect as defined by Miss. Code Ann. § 11-1-63(a)(i)(1) (Supp. 2001). Section 11-1-63 provides, in pertinent part:

> In any action for damages caused by a product except for commercial damage to the product itself:

> (a) The manufacturer or seller of the product shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller:

> (i)(1) The product was defective because it deviated in a material way from the **manufacturer's specifications** or from otherwise identical units manufactured to the same **manufacturing specifications**. . . .

(emphasis added).

¶57. The requisite specifications serve as the standard against which the allegedly mismanufactured product is to be measured. By establishing such, the MPLA relieves a plaintiff of the burden of proving that the defect occurred through the defendant's negligence or other fault. Cooper's specifications were provided to the Tuckiers during discovery, but the Tuckiers failed to offer them into evidence or present testimony as to how the subject tire deviated from the specifications.

¶58. The majority accepts the Tuckiers' assertion that, even without the manufacturer's specifications, the "good stock / bad stock" distinction is an adequate standard against which a deviation may be established. In my view, "good stock" is not an adequate standard against which the deviation of a product can be measured so as to relieve the plaintiff of the burden of proving that the defect occurred the manufacturer's negligence or other fault.

¶59. The majority holds that the Tuckiers met their burden of proof through the testimony of their expert, Max Nonnamaker. Nonnamaker testified that the rubber between the two steel belts of the tire failed to form a proper chemical bond because Cooper used old rubber stock in building the tire. Nonnamaker's <u>entire</u> testimony regarding the old rubber stock is as follows:

> Q. . . . Based on your examination of this tire, can you tell us what the most probable reasons for this tire peeling and ripping apart are?
>
> A. Yes.
>
> Q. What are they?
>
> A. The stock that was used to build the tire in the steel belts was probably dry or set up. In other words, the rubber had started to kind of cure, and it had kind of a covering over the top of it, and that kept it from bonding together chemically. Now, it was bonded together physically because you use a lot of pressure and heat and time for curing the tire, so it was bonded together mechanically but not chemically, which is what you need in order to get a tire that will not fail.
>
> And for that reason this tire ran for quite some distance, but it finally started coming apart at the interface of the rubber that encases the steel belts. And that probably is due to the fact that even though you're supposed to use the steel belts as they're prepared as an in and out basis so that they don't set for a long period of time, what can happen is for some reason, there was too long a period of time and they neglected to handle the drier set of stock.
>
> What you do on drier set of stock you can then put benzene, or used to be you could benzene on it. They no longer use benzene, but they use a solution that improves the tackiness of the rubber so that it breaks down the film that has developed from the drier set of stock so that it will chemically bond together. There's an interlinking of the molecules in the rubber, a cross-linking so that you get the proper cure.
>
> And you heard just from the previous witness that for 10- or 12-day period at the end of the year they're closed down, so that stock has started getting dry, and this wasn't built until the fourth week. So not every tire is bad or not every tire fails, but there's a weakness that was built into the tire that is consistent with the fourth week of 1992.

¶60. Nonnamaker then went on to testify that, in his opinion, the accident was not caused by under-inflation, road hazards, or tire aging. No testimony was ever offered that the length of time which Cooper retained stock before using it fell short of Cooper's specifications, or any other standards, for that matter. No testimony was offered as to how long the materials should remain unused. In fact, no testimony was offered by the Tuckiers demonstrating the length of time which the materials actually did remain unused.

¶61. In short, Nonnamaker testified that the tire was not constructed in the way it should have been constructed. However, without evidence of standards establishing the way in which the tire should have been constructed, Nonnamaker's theory fails to demonstrate the existence of a defect under the § 11-1-63(a)(i)(1). Stated otherwise, a product is not "defective" under § 11-1-63(a)(i)(1) unless it is shown to be out of compliance with the manufacturer's specifications. *See **Leverette v. Louisville Ladder Co.**,* 183 F.3d 339, 341 (5th Cir. 1999) (holding that expert's testimony that ladder had manufacturing defect was

properly excluded in products liability action under Mississippi law where expert failed to assess whether ladder met manufacturer's specifications).

¶62. Larry Dowd, a product assurance manager for Cooper at the Texarkana plant, testified that Cooper has a 30-day limit on the amount of time materials are allowed to sit before they are utilized in the manufacturing process. Dowd testified that the 30 days was never exceeded because the plant maintains a 24-hour inventory - that is, all materials are used with twenty-four hours. The fact that the materials sat in the plant for 12 days during the holiday shutdown does not demonstrate that they sat for longer than the 30-day rule adhered to by Cooper. Again, the subject tire was manufactured the last week in January 1992.

¶63. The two Cooper employees who testified that Cooper used old stock, Jimmy Oats and Richard Angell, did not testify that the materials were unused for more than 30 days. They merely testified that Cooper was using "old stock." Again, there is no testimony identifying what constitutes "old stock" or whether Cooper used stock which failed to meet this undefined standard. In my view, not only was no deviation proven, but the Tuckiers failed to show the standard against which a deviation is measured.

¶64. "Good stock/bad stock" and "fresh stock/old stock" are not sufficient standards under the MPLA. Proof of a standard or specification, if any, exists in the uncontradicted testimony that Cooper required its stock to be utilized within 30 days, and, again, there was no proof that the subject tire was manufactured from materials older than 30 days.

## II. NEGLIGENCE

¶65. The Tuckiers also failed even to make a prima facie case for to support its negligence claim. Even assuming that the standard of care for a negligence claim may be shown by more than the manufacturer's own specifications, which, as discussed previously, were not admitted at trial, the Tuckiers failed to put forth any evidence that Cooper's stated practice of scrapping stock more than 30 days old fell short of any industry-wide standard. There was simply no testimony at trial establishing a standard by which to measure Cooper's conduct. Simply arguing that stock was "too old" or "bad" is, in my view, insufficient to sustain the Tuckiers negligence claim.

## III.

¶66. The trial court erred in denying Cooper's request for directed verdict. The Tuckiers failed to make a prima facie case on either the defect claim or the negligence claim. The trial court's judgment should be reversed and rendered for Cooper Tire.

¶67. For these reasons, I respectfully dissent.

**PITTMAN, C.J., AND COBB, J., JOIN THIS OPINION.**

1. Oral arguments in this case were held before the Court on May 23, 2001.

2. Cooper also attached the affidavit of its corporate counsel, Scott Pinzone, attesting to the above to its Alternative Motion for Judgment Notwithstanding the Verdict or For a New Trial or To Alter or Amend the Judgment. This motion was denied by the trial court.